72 F.3d 1017
 106 Ed. Law Rep. 51
 Leroy LOGAN, Plaintiff-Appellee-Cross-Appellant,
v.
BENNINGTON COLLEGE CORPORATION, Defendant-Appellant-Cross-Appellee,
Trustees of Bennington College, Elizabeth Coleman, Joan
Goodrich, Ronald Cohen, Daniel Michaelson, Betsy
Sherman, Adrienne Marcus, and Liz
Pellerin, Defendants.
 Nos. 1630, 1761, Dockets 94-7976L, 94-9012.
 United States Court of Appeals,
Second Circuit.
 Argued May 18, 1995.
Decided Dec. 14, 1995.
As Amended March 11, 1996.
 
 Mitchell L. Pearl, Langrock Sperry & Wool, Middlebury, Vermont (Ellen Mercer Fallon, Langrock Sperry & Wool, on the brief), for defendant-appellant-cross-appellee.
 William K. Sessions, Sessions Keiner Dumont & Barnes, P.C., Middlebury, Vermont (Bonnie Barnes, Sessions Keiner Dumont & Barnes, P.C., on the brief), for plaintiff-appellee-cross-appellant.
 Before: LUMBARD, ALTIMARI, and MAHONEY, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Defendant-appellant-cross-appellee Bennington College ("Bennington" or "College") appeals from a judgment of the United States District Court for the District of Vermont (Billings, J.), following a jury verdict, awarding plaintiff-appellee-cross-appellant Leroy Logan ("Logan") damages for breach of contract. We affirm the district court's granting of Bennington's pre-trial motion for summary judgment, thereby dismissing Logan's due process and negligence claims. We reverse, however, the judgment of the district court denying Bennington's post-trial motion for judgment as a matter of law on Logan's breach of contract claims, and remand this case with instructions to vacate the verdict and jury award entered against Bennington.
 
 BACKGROUND
 
 2
 The present case centers on Bennington, a small college located in Vermont which has always prided itself on progressive and non-traditional pedagogy. Recently, Bennington has been criticized by former faculty members and other educators because its President, Elizabeth Coleman ("Coleman"), has undertaken measures to downsize the school. Since 1987, when Coleman took office, nearly one third of the faculty has been dismissed, ostensibly for fiscal reasons. Moreover, Bennington has ended its "presumptive tenure" plan, under which, absent certain circumstances, professors held a five-year term of employment with the College that was automatically renewed for another five-year term.
 
 
 3
 Logan taught drama for eighteen years at Bennington, until his discharge on July 20, 1990, for alleged sexual harassment. At the time the incidents underlying this case occurred, Logan, like other professors at Bennington, had presumptive tenure. As described in section 9.43 of the Bennington College Faculty Handbook ("Faculty Handbook"), a professor with presumptive tenure held a contract for a five-year term of employment with the College. The College was obligated to extend that contract for another five years, unless the professor substantially failed to perform the terms of his or her employment contract with the College, or exigent financial circumstances or changes in educational policy required elimination of the teaching position.
 
 
 4
 On May 16, 1990, a male student of Logan's ("complainant") filed a complaint with the College alleging that Logan forced the student to have sexual relations with him on Thanksgiving Day, 1989, in Wales, where Logan was directing a College-sponsored program (the "London Program") in which the complainant was a participant. The student's complaint was referred to the College's Sexual Harassment Committee pursuant to an interim policy on sexual harassment instituted by Bennington on September 1, 1989 ("interim policy").
 
 
 5
 The interim policy was designed to replace the College's older policy regarding sexual harassment that had existed since 1982 ("older policy"). Bennington's legal counsel had advised the College that the older policy might not comply with state regulations. Moreover, in an unrelated harassment case against Bennington brought before the Vermont Human Rights Commission ("HRC") by another student, Bennington had signed a conciliation agreement with the HRC which provided that, among other things, Bennington would revise its sexual harassment policy. Accordingly, in 1989 Coleman appointed a six-member committee to draft an interim policy on harassment, which Coleman approved in August, 1989, and the Board of Trustees authorized to take effect as of September 1, 1989.
 
 
 6
 While the interim policy retains the definition of sexual harassment under the older policy, it is more comprehensive than the older policy with respect to the informal and formal procedures to be followed in cases of complaints alleging sexual harassment. For example, the older policy, contained in Section 1.47 of the Faculty Handbook and consisting of three single-spaced pages, established a three-member grievance committee comprised of both genders which was authorized to investigate complaints of sexual harassment and, if the dispute could not be resolved informally, to hold a hearing. Two of the three grievance committee members were appointed by the College President. The only procedures outlined by the older policy were that (i) notice of the complaint and hearing be given to the parties, (ii) the complainant be allowed to attend the hearing, (iii) minutes of the hearing be kept, and (iv) the result of the hearing could be appealed to the College President.
 
 
 7
 By contrast, the interim policy is seven single-spaced pages, and establishes more specific procedures at all stages of the grievance process, both informal and formal. Among other things, the new policy creates a five-member Sexual Harassment Committee ("Committee") to investigate and hear formal complaints alleging sexual harassment. The Committee members are appointed by the College President, and include the Director of Student Affairs, who chairs the Committee, two faculty members, one staff member, and one student. According to the interim policy, the Committee's primary function is to conduct hearings for all formal sexual harassment complaints at the College. The Committee can also hear appeals from decisions by the College in informal harassment proceedings. The interim policy authorizes the Committee to establish its own procedures, and to contact all persons who are involved in the case, provided that notice of such contact is given to the parties.
 
 
 8
 If, after the formal hearing, the Committee concludes that formal disciplinary action against a faculty member is called for, it may recommend to the College President one of several sanctions, including discharge from employment at the College. Appeals from a decision by the Committee may also be taken to the College President within ten days of the decision. The format for such appeals is left to the discretion of the College President. The College President may implement, modify or suspend the sanctions recommended by the Committee, and his or her decision is final. The interim policy further provides that formal complaints of sexual harassment are to be resolved as promptly as possible, and recommends that a written decision be rendered within thirty days of the filing of a complaint.
 
 
 9
 Logan received notice of the complaint and hearing, as well as a list of seven students who would be interviewed by the Committee as potential witnesses. He acknowledged receipt of the hearing notice, and submitted his own list of twelve witnesses. The Committee notified Logan that only those witnesses with potential direct knowledge of the incidents at issue, namely those in the London Program at the time of the alleged harassment, would be permitted to testify. A five-hour hearing was held on May 31, 1990, at which the complainant, Logan and seven students who had participated in the College's London Program testified. Logan was assisted by a faculty representative. The parties were permitted to question witnesses and read statements, and were examined by the Committee members.
 
 
 10
 The Committee deliberated for several days, and in a written report and recommendation unanimously recommended termination of Logan. The Committee members found the complainant's testimony detailed and credible, and Logan's testimony vague and uncorroborated by several of the witnesses. The Committee's recommendation was sent to Coleman. Logan appealed the decision to Coleman, who held a hearing on the matter in which Logan was represented by counsel. At the hearing's conclusion, Coleman declined to alter the original decision, and Logan was terminated.
 
 
 11
 On April 25, 1991, Logan commenced the instant action against the College and the individual faculty and staff members who were involved in the decision to terminate him. Seeking reinstatement and damages, Logan's complaint alleged claims for breach of contract, negligence, denial of federal and state due process, and defamation. Prior to trial, Logan stipulated to the dismissal of the defamation claim. Except for the breach of contract claims against the College, the remaining claims were dismissed by the district court's grant of summary judgment in favor of Bennington. The breach of contract claims against the College proceeded to trial.
 
 
 12
 At trial, Logan contended that when he was hired, he was told that the terms of his employment contract were set forth in the Faculty Handbook. He proceeded to present four separate breach of contract theories to the jury. First, Logan contended that Bennington adopted the interim policy in violation of his contractual rights contained in the Faculty Handbook. Second, he contended that Bennington failed to afford him the procedural rights guaranteed under his employment contract. Third, Logan claimed that Bennington lacked good cause to terminate him because the charges against him were untrue. Fourth, Logan claimed that by terminating him, Bennington breached an implied contractual duty of good faith and fair dealing. After a four-day trial, the jury rendered a verdict in favor of Logan in the amount of $500,000. The district court reduced the amount to approximately $200,000, on the ground that the jury disregarded the Court's instruction that punitive damages were not available to Logan as a remedy. The district court also denied Bennington's motions for judgment as a matter of law and for a new trial.
 
 
 13
 Bennington now appeals from the district court's denial of it motion for judgment as a matter of law. Logan cross appeals from the district court's order granting summary judgment in favor of Bennington and dismissing his claims based on negligence and due process, as well as the district court's ruling disallowing the jury's punitive damages award.
 
 DISCUSSION
 I. BENNINGTON'S APPEAL
 
 14
 As noted above, the only claim considered by the jury was Logan's allegation of breach of his employment contract. It is unclear from the record, however, which of the four theories presented by Logan as the bases for his breach of contract claims were relied upon by the jury in reaching its verdict. Thus, in order to prevail on this appeal, Bennington must demonstrate that there was no legally sufficient evidentiary basis for a reasonable jury to have found in Logan's favor with respect to any of the four theories underlying his breach of contract claims. See Fed.R.Civ.P. 50(b).
 
 
 15
 As we have previously explained, judgment as a matter of law is appropriate when there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]." See Concerned Area Residents For The Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir.1994) (internal quotations and citations omitted), cert. denied, --- U.S. ----, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The Court views the evidence in the light most favorable to Logan, and gives Logan the benefit of all reasonable inferences from the evidence that the jury might have drawn in his favor. See id. In considering the evidence, the Court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury. See Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59 (2d Cir.1993).
 
 
 16
 Preliminarily, the issue of whether the Faculty Handbook contains the contract of employment between Bennington and Logan must be briefly addressed. Under Vermont law, disputes concerning the agreed-upon terms and conditions of an employment contract are an issue of fact for the jury to decide. See Sherman v. Rutland Hosp., Inc., 146 Vt. 204, 500 A.2d 230, 231-32 (1985). Bennington does not dispute this as a general rule, but contends that, because the Faculty Handbook contains much extraneous information, such as library policy and the available meal plans, it cannot be regarded as a contract. The Faculty Handbook, however, addresses many matters that would typically be included in an employment contract. Indeed, section 9--which contains, among other things, the provisions regarding presumptive tenure--is entitled "Conditions of Employment." The jury, therefore, could reasonably have interpreted the relevant portions of the Faculty Handbook as constituting the contract of employment between Logan and the College, and containing the rights and obligations of the parties.
 
 
 17
 1. Approval of the Interim Policy.
 
 
 18
 Logan first contended that the adoption of the interim policy constituted a breach of contract, because it was not approved by the faculty as required by the Faculty Handbook.
 
 
 19
 Section 9.46 of the Faculty Handbook provides that in matters relating to personnel policies, including contract terms and discipline, decisions are to be made by a process of mutual consultation between the College President, the Faculty Personnel Committee ("FPC"), the faculty, and the College Board of Trustees. The section further provides that "[n]o changes of policy of substantial importance" may be undertaken "except upon the recommendation of the full faculty after a report from the President and the FPC," and "[n]o substantive administrative decision affecting [the] faculty" can be made except after consultation with the FPC. According to Logan, adopting the interim policy required consultation with the entire faculty because it effected a "substantial change" from the older harassment policy contained in section 1.47 of the Faculty Handbook, by transferring control over the disciplinary process from the faculty to the administration.
 
 
 20
 The interim policy was not presented to the faculty or the FPC prior to its implementation; rather, it was approved by Coleman and the Board of Trustees. In a letter dated September 1, 1989, President Coleman notified faculty, students, and administrative personnel that the interim policy would replace the older policy printed in the various college handbooks, including the Faculty Handbook, and that the interim policy would be in place for the 1989-1990 academic year. Despite the lack of faculty consultation, nothing in the College's process of formulating, adopting, and implementing the interim policy supports Logan's contention that Bennington's adoption of the interim policy constitutes a breach of contract under the Faculty Handbook.
 
 
 21
 First, the substantive and procedural standards governing harassment cases in the interim policy are nearly identical to those contained in the older policy. For example, the definition of harassment in the two policies is identical. Each policy also requires the investigation of a formal complaint of harassment by a specially constituted committee, and prescribes both notice to the person charged with harassment, and a hearing on the matter. Both policies further provide for an appeal of the committee's decision to the College President. Significantly, other than requiring an investigation into the charges, notice of the charges to the accused, a hearing on the matter, and an appeal to the College President, the two policies are silent as to what procedures were to be utilized by the committees authorized to handle the matter.
 
 
 22
 Second, the older and interim policies provide for disciplinary and appellate proceedings in the case of sexual harassment allegations which are distinct from the disciplinary and appellate proceedings governing termination of presumptive tenure. Contrary to Logan's contentions, under the older policy neither the faculty nor the FPC had a role in disciplining persons charged with sexual harassment. Section 1.47 of the older policy provided for resolution of harassment claims by a three-member grievance committee, two of whom were appointed by the College President. Their decision could be appealed to the College President. No provision was made in the older policy for review of the grievance committee's decision by the FPC or any other faculty representative. The interim policy provides that all formal harassment complaints shall be handled by the five-member Sexual Harassment Committee, whose members are appointed by the College President. The Committee's decision can be appealed to the President. Like the older policy, the interim policy does not provide for the involvement of the faculty or FPC in disciplining members accused of harassment.
 
 
 23
 Thus, the interim policy did not change the College's harassment policy in any substantial way, such that the faculty-wide and FPC consultation and approval under the provisions of section 9.46 of the Faculty Handbook would be required prior to the policy's adoption. Rather, the interim policy created additional informal procedures in harassment cases, and amplified what procedures could be followed by the Sexual Harassment Committee in formal complaints, while retaining that Committee's discretion to "decide on its own procedures." Indeed, had Logan's case arisen under the older policy, it is clear that the proceedings would not have differed in any significant respect.
 
 
 24
 Finally, assuming for the moment that Coleman's failure to present the interim policy to the faculty for approval constituted a breach of the employment contract, Logan would be entitled to nothing more than nominal damages for that breach. Any monetary damages incurred by Logan in this case could not have been caused by the alleged breach, because the provisions contained in the two policies governing harassment cases are substantively the same. Rather, Logan's monetary damages, if any, resulted from his termination. The College's alleged failure to acquire faculty approval for the interim policy affected all the faculty members in an equal manner, and as a result Logan can only be entitled to--as would other faculty members--nominal damages. See, e.g., Weeks v. Local 1199, Drug, Hosp. and Health Care Employees Union, 892 F.Supp. 568, 574 (S.D.N.Y.1995) (where breach of union contract does not cause economic loss, injured party entitled to nominal damages); cf. Dannhausen v. Business Publications Audit of Circulation, Inc., 797 F.2d 548, 552 (7th Cir.1986) (association's by-laws are in the nature of a contract between the association and its members, and a breach of the by-laws entitles the association's members to nominal damages).
 
 
 25
 Accordingly, the adoption of the interim policy without faculty approval cannot serve as the basis for the jury's verdict and award to Logan. There is insufficient evidence in the record for a reasonable jury to find that Bennington adopted the interim policy in violation of any of the procedures outlined in the Faculty Handbook.
 
 
 26
 2. Procedural Rights Under the Contract.
 
 
 27
 Logan alleges that a variety of "procedural flaws" occurred during his hearing and appeal, such as his not being able to speak with witnesses prior to the hearing, and the Committee's consideration of his drinking problems during its deliberations. According to Logan, these alleged flaws, which are delineated and discussed more fully below in the section dealing with Bennington's alleged breach of the duty of good faith and fair dealing, violated his procedural rights under his employment contract with Bennington.
 
 
 28
 Logan's contentions are without merit. None of the alleged flaws he cites contravene a specific provision found in the interim policy or elsewhere in the Faculty Handbook. Rather, these alleged flaws concern procedures that Logan believes should have been afforded him. Except for the required notice of charges against the accused and holding a hearing, however, neither the older policy nor the interim policy specifies any particular procedural requirements that the grievance committee or the Sexual Harassment Committee must follow. The interim policy authorized the Sexual Harassment Committee to formulate its own procedures. As a result, because Logan can point to no provision in his employment contract regarding "procedural rights" that Bennington breached, his claim that Bennington breached the employment contract as a result of "procedural flaws" in his disciplinary hearing and appeal is insufficient to support the jury's verdict.
 
 3. Good Cause
 
 29
 Logan's third theory of breach of contract was that Bennington lacked good cause to terminate him, as required by the terms of the presumptive tenure provision. To show Bennington's alleged lack of good cause, Logan asserted at the trial that he was actually innocent of the charges and offered evidence which allegedly demonstrated that his hearing was procedurally "flawed." On appeal, Logan asserts that he should receive a trial de novo in the district court on the question of his guilt. He contends that if the jury believed that he was innocent, it could conclude that Bennington did not have sufficient cause to fire him. Bennington, on the other hand, argues that Logan's innocence is not determinative of the breach of contract action. Moreover, it contends that Logan was only entitled to the procedural protections contained in his employment contract, and that he cannot claim lack of good cause based on what he believes would have been better procedures.
 
 
 30
 Initially, we note that neither the presumptive tenure provisions of the Faculty Handbook nor the interim policy mention "cause" for terminating a faculty member. Rather, the presumptive tenure provisions state that a five-year presumptive tenure contract will not be automatically renewed if the professor substantially fails to perform the terms of his or her employment contract with the College, or exigent financial circumstances or changes in educational policy require elimination of the teaching position. The interim policy provides that termination of the accused is one option the Committee may recommend after it makes a determination that the charges of sexual harassment are substantiated. Clearly, these provisions can be considered as two independent grounds of "cause" for terminating a faculty member.
 
 
 31
 We agree with Bennington that the primary issue under this theory of breach of contract presented by Logan is not his guilt or innocence with respect to the harassment charges. Rather, the primary issues are (1) whether Logan presented any evidence that Bennington discharged him without cause, or (2) whether he received fewer procedural protections than he was entitled to receive under his employment contract. With regard to the first issue, Logan failed to present any evidence at trial establishing that he was discharged without cause. Instead, he merely asserted his innocence in a conclusory manner. His bald assertions of innocence are insufficient as evidence that he was discharged without cause. Given that the College had the authority under the relevant provisions of the Faculty Handbook and interim policy to terminate a faculty member, Logan's claim that he was discharged without "good cause" in the face of his failure to present any evidence to the contrary is unavailing.
 
 
 32
 With respect to the second issue, Logan's attempt to demonstrate that there was no good cause to fire him because the hearing procedures were "fatally flawed" and a "sham" is equally unavailing. As discussed above, there is no merit to Logan's contention that the hearing and appeal were procedurally flawed. Logan's employment contract did not afford him the right to have all disciplinary proceedings conducted in any manner he wished, or resolved in his favor. Under the older and interim policies, Logan was entitled to a hearing, notice of the charges against him, and a right to appeal to the College president, all of which he received. Logan's assertion that the hearing was a "sham" is nothing more than a restatement of his contention that the proceedings were procedurally flawed. This assertion is considered below, in our discussion of Logan's claim that Bennington breached its duty of good faith and fair dealing.
 
 
 33
 We conclude that Logan put forth no evidence that Bennington discharged him without cause. Accordingly, the jury's verdict and award to him could not be based on the theory that Bennington breached its contract by discharging him without good cause.
 
 
 34
 4. Breach of Duty of Good Faith and Fair Dealing
 
 
 35
 The final argument Logan relies upon to support his claim for breach of contract is that Bennington breached its obligation of good faith and fair dealing by conducting a "sham" hearing.
 
 
 36
 "Under Vermont law, an 'implied covenant of good faith and fair dealing prevails in every contract.' " McHugh v. University of Vermont, 758 F.Supp. 945, 953 (D.Vt.1991) (citation omitted), aff'd, 966 F.2d 67 (2d Cir.1992). The duty implies that "neither party shall do anything to injure or destroy the rights of the other party to receive the benefits of the agreement." Shaw v. E.I. DuPont de Nemours & Co., 126 Vt. 206, 226 A.2d 903, 906 (1966) (citing Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163, 167 (1933)); see also Carmichael v. Adirondack Bottled Gas Corp. of Vermont, 161 Vt. 200, 635 A.2d 1211, 1216 (1993) (the covenant of good faith and fair dealing is broadly interpreted, and "exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' ") (citation omitted). The burden of showing breach of the covenant is on the plaintiff. See Lambert v. Equinox House, Inc., 126 Vt. 229, 227 A.2d 403, 404-05 (1967); Burke v. N.P. Clough, Inc., 116 Vt. 448, 78 A.2d 483, 485-86 (1951).
 
 
 37
 At trial, Logan alleged a variety of errors in the hearing that, even if they did not constitute a violation of an express contractual provision, taken together allegedly demonstrated that his hearing was not conducted in good faith and thus, as he describes it, rendered the hearing a "sham." Specifically, Logan alleged that: (1) the Committee chairperson acted as both investigator and judge because she questioned witnesses prior to the hearing; (2) the chairperson met with the complainant prior to the hearing, and did not disclose this fact to Logan; (3) although Logan was told who the witnesses would be at the hearing, he was forbidden from speaking with them prior to the hearing; (4) the chairperson allegedly sought to uncover evidence of Logan's past behavior (earlier incidents of harassment and excessive drinking) prior to the hearing; (5) Logan was not allowed to present favorable character evidence, nor was he allowed to present evidence impeaching the credibility of the complainant; (6) several Committee members were biased against Logan (one professor had the complainant as a student, and another professor allegedly thought Logan was an "overweight drunk"); (7) the Committee members allegedly discussed Logan's problems with alcohol during their deliberations; (8) because he was instructed not to speak to witnesses before the hearing, Logan lost the opportunity to speak to Peter Dinklage, who was with Logan and the complainant on the night of the alleged harassment, and who would have allegedly corroborated Logan's account of the incident underlying the charges; (9) Logan was told only immediately prior to the hearing that only he and his advocate could examine the witnesses, and that witnesses could not issue prepared statements; (10) no recording was made of the hearing; and (11) Coleman both suggested the appropriate punishment and heard Logan's appeal. Logan argues that taking these errors together, a jury could conclude that Bennington "breached its obligation of good faith and fair dealing with Professor Logan when it subjected him to such a mockery of reasoned evaluation of the evidence against him."
 
 
 38
 These "errors" that Logan cites do not support his claim for breach of the duty of good faith and fair dealing, as a matter of law. First, even under the older policy, committee members took active roles in all phases of the hearing. Logan's argument implies that in the private employment context, investigation and decision-making with respect to discipline must always be performed by different persons. However, there is no basis for such a rule. Second, except for the Committee members, neither Logan nor anyone else was permitted to question witnesses prior to the hearing, and Logan was free to examine the witness at the hearing. Third, Logan does not suggest why he could not elicit the alleged favorable information from Peter Dinklage upon questioning him at the hearing, rather than talking to him prior to the hearing. Fourth, no character evidence of any kind was permitted during the hearing with respect to Logan or the complainant.
 
 
 39
 We acknowledge that some of the Committee members were aware of and considered Logan's reputation for engaging in similar conduct in the past, and his excessive drinking. But their considerations do not rise to a level of bad faith, and beyond mere assertion and speculation, Logan has not shown how the Committee's consideration of his past behavior and drinking constitutes a breach of the duty of good faith and fair dealing. Similarly, his allegation that two members of the Committee were biased against him also rests on speculation. Logan does not suggest why the fact that one professor on the Committee who had the complainant in her class indicates bias on that professor's part. As to the other professor alleged to be biased because he considered Logan an "overweight drunk," Logan fails to mention that he consented to this professor's presence on the Committee.
 
 
 40
 In essence, Logan's contention is that the procedure at the hearing should have been different, and the fact that it was not evidences that Committee's bias against him. None of his allegations of bias, however, rise to the level necessary for finding a breach of the duty of good faith and fair dealing. Moreover, even accounting for all reasonable inferences in Logan's favor, nothing in the record supports the conclusion that there was sufficient evidence that would allow a reasonable jury to find for Logan on the claim that Bennington breached its duty of good faith and fair dealing. The Committee's conduct and the procedures followed by it during the course of Logan's hearing and appeal did not deprive Logan of any substantive or procedural rights or benefits he had under his employment contract.
 
 
 41
 5. Summary.
 
 
 42
 None of the four grounds raised by Logan to support his breach of contract claim justifies the jury's verdict. As a result, the district court erred in denying Bennington's motion for a judgment as a matter of law and its decision must, therefore, be reversed and the matter remanded to permit vacatur of the verdict and award.
 
 
 43
 Because we conclude that the district court erred in entering judgment for Logan on his breach of contract claim, we need not address Bennington's alternative arguments in support of reversal. We therefore move on to consideration of Logan's cross appeal, although we need not resolve Logan's claim that the district court erred in failing to instruct the jury that it could award punitive damages based on Bennington's breach of contract. We consider only that portion of Logan's cross appeal which challenges the refusal of the district court to submit certain theories of liability to the jury.
 
 II. LOGAN'S CROSS-APPEAL
 
 44
 1. Due Process.
 
 
 45
 Logan contends that the district court erred in granting summary judgment on his due process claims. He alleges that both his federal and state due process rights were violated by Bennington's conduct.
 
 
 46
 Although Bennington is a private university, Logan contended before the district court that the Vermont HRC's involvement in the conciliation agreement, which required that Bennington change its harassment policy, constituted enough involvement by the state to render Bennington's conduct "state action" for purposes of a due process challenge. The district court rejected this argument after affording Logan ample time for discovery. In an unpublished order granting summary judgment in favor of Bennington on the due process claims, the district court held:
 
 
 47
 There is no evidence that the Commission [HRC] had any involvement in preparing, drafting, or revising the College's sexual harassment policy. Nor did it take any part in the proceedings against plaintiff. The Commission's involvement with the College's sexual harassment policy was one of urging the College to revise a pre-existing policy, the Commission having been involved in the settlement of a separate and distinct discrimination complaint between the College and one of its students. Consequently, there is no state action, compulsion or conduct.
 
 
 48
 Logan contends on appeal that there was enough ambiguity surrounding the state's role to preclude summary judgment on this issue. Moreover, he contends that the district court abused its discretion in quashing his subpoena to depose the executive director of the HRC. Logan's contentions are without merit.
 
 
 49
 With regard to his claim concerning the subpoena to depose the executive director of the HRC, we review the district court's quashing of the subpoena for a clear abuse of discretion. See Cruden v. Bank of New York, 957 F.2d 961, 972 (2d Cir.1992). Logan's assertion that the director would have provided information suggesting that the state was actively involved in fashioning Bennington's policy and prescribing Logan's dismissal, is mere speculation. Moreover, Logan was afforded discovery as to all of Bennington's employees and all written correspondence between Bennington and the HRC. In light of Logan's access to these documents and his failure to suggest why the deposition would produce evidence beyond that which was already memorialized in the documents, the district court did not abuse its discretion in quashing the subpoena.
 
 
 50
 With regard to the merits of the due process claim, a "state action" occurs where the challenged action of a private party is "fairly attributable" to the state. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (the conduct of the private party "may be fairly treated as that of the State itself."). Private party conduct is fairly attributable to the state when (1) the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." Lugar, 457 U.S. at 937, 102 S.Ct. at 2753-54. A party may be a "state actor" because he or she "is a state official, because he [or she] has acted together with or has obtained significant aid from state officials, or because his [or her] conduct is otherwise chargeable to the State." Id. Characterizing a private party as a "state actor" is a fact-specific inquiry, and courts considering the issue typically look to such factors as the public function of the party's conduct, whether the private party acted under state compulsion, the nexus between the party's conduct and the state, and whether the party's conduct was jointly undertaken with the state. See id. at 939, 102 S.Ct. at 2754.
 
 
 51
 In the instant case, Bennington reached a conciliation agreement in an unrelated harassment case with the HRC, pursuant to which it agreed, among other things, to settle a student's harassment claim against another Bennington professor, and to revise its harassment policy in order to comply with the law. Because the HRC was involved in the conciliation agreement, the district court noted that the interim policy was adopted at the Vermont HRC's "urging." The HRC, however, had no involvement in Logan's case. The question is, thus, whether Bennington functioned as a state actor solely because the HRC was part of the impetus for the adoption of Bennington's interim policy. According to Logan, any action undertaken in compliance with the interim policy is state action, because the HRC provided part of the impetus for adopting that policy.
 
 
 52
 Logan's argument stretches the meaning of state action too far. Bennington was revising its policy to comply with Vermont law, but its action in terminating Logan was in no way dictated by state law or state actors. Our decision in Albert v. Carovano, 851 F.2d 561 (2d Cir.1988) (in banc) is instructive in this matter. In Albert, we considered whether a private university's adoption of a disciplinary code in order to comply with state law constituted state action. The state neither drafted the disciplinary code, nor participated in determining what sentence was to be handed out under it. We held that there was no state action under these circumstances, and that state action would not be found unless "the particular sanction under challenge was imposed as a result of the acts of state officials ... or as a result of 'a reasonable and widespread belief' by college or university administrators that the imposition of the sanction was required [by a particular state law.]" Id. at 570. See also Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) ("[O]ur precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.").
 
 
 53
 Here, there is an insufficient nexus between the HRC and Logan's termination under Bennington's interim policy to warrant a finding of state action. His termination was neither imposed by the acts of state officials acting alone or in concert with College officials, nor imposed by Bennington in the belief that it was required by law. The interim policy afforded several courses of action that the College could take once the Committee found that Logan committed the harassment, and the ultimate decision to terminate Logan was Coleman's. The district court, therefore, correctly granted Bennington's motion for summary judgment dismissing Logan's federal due process claim.
 
 
 54
 The district court also relied on the lack of state action to grant Bennington's motion for summary judgment with respect to Logan's claim of violation of his due process rights under the Vermont Constitution. The district court assumed, without addressing the issue, that state action is required for state due process protection to be triggered. On appeal, Logan argues that state action is not required for due process protection under the Vermont Constitution, because Vermont's Constitution is based on an "ideologically different basis" than the federal constitution, namely libertarianism. In support of this contention, Logan cites to Chapter I, Articles 9 and 10 of Vermont's Constitution, which provide in relevant part that "no part of any person's property can be justly taken from him, ... without his own consent,.... nor can any person be justly deprived of his liberty, except by the laws of the land." He then contends that because there is no express reference in these passages to state action, the Vermont Constitution must protect life, liberty, and property against deprivation without due process by any entity, not just by action of the state.
 
 
 55
 The only case Logan presents in support of his novel argument is a concurring opinion from State of Vermont v. Kirchoff, 156 Vt. 1, 587 A.2d 988 (1991), in which, according to Logan, the concurrence stressed the libertarian underpinnings of the Vermont Constitution. See id. at 998 (Springer, District Judge (Ret.), concurring). Notwithstanding the merits of the Kirchoff concurrence's discussion, it is quite another matter--indeed, a gigantic jurisprudential leap of logic--to infer that, therefore, a due process claim under the Vermont Constitution does not require state action. Other than the concurring opinion in Kirchoff, Logan cites no case supporting his proposition that under the Vermont Constitution private entities acting as such are bound to provide due process to private individuals in the absence of state action. The argument is unprecedented. In the absence of authority directly supporting his proposition, we hold that the district court correctly granted summary judgment on Logan's state-based due process claim.
 
 
 56
 2. Negligence.
 
 
 57
 Logan contends that the district court also erred in granting summary judgment to Bennington on his negligence claim. Logan's complaint alleges that Bennington negligently exercised its duty to investigate, prosecute, and judge him. More specifically, Logan alleges that Bennington was negligent in restricting the testimony allowed at the hearing and refusing to allow a meaningful appeal. The district court granted summary judgment on the grounds that Logan's claim was too "vague," in that he failed to specify the duty of care that was breached.
 
 
 58
 On appeal, Logan elaborates on the supposed duty of care that Bennington owed him. He contends that Bennington owed him a duty of care by virtue of extending him tenure, and that it breached this duty by modifying the sexual harassment policy without faculty approval. Bennington argues that Logan's claim is a contract claim masquerading as a tort claim. We agree.
 
 
 59
 The duty of care that Logan claims is due him is nothing more than the claim that he is entitled to receive that which is due him under the contract. See Breslauer v. Fayston Sch. Dist., --- Vt. ----, 659 A.2d 1129, 1132-33 (1995) (explaining that breach of a contractual obligation does not create an independent tort); accord Clark-Fitzpatrick, Inc. v. Long Island R.R., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193-94 (1987) ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.") (citations omitted). Because Logan is unable to describe a more particular duty that is independent of Bennington's obligations under the employment contract, we affirm the district court's dismissal of Logan's negligence claim.
 
 CONCLUSION
 
 60
 Based on the foregoing, we affirm the district court's grant of Bennington's motion for summary judgment and dismissal of Logan's due process and negligence claims. We reverse, however, the judgment of the district court denying Bennington's motion for judgment as a matter of law, and remand this case with instructions to vacate the verdict and jury award entered against Bennington College.
 
 ORDER AMENDING OPINION
 March 11, 1996
 
 61
 PER CURIAM.
 
 
 62
 IT IS HEREBY ORDERED that this Court's decision in Logan v. Bennington Corp., No. 94-7976L, slip op. 8917 [72 F.3d 1017] (2d Cir. Dec. 14, 1995), is amended as follows:
 
 
 63
 At slip op. 8919 [1020], delete the following language appearing at lines 22-32:
 
 
 64
 [Editor's Note: Amendments incorporated for purpose of publication.]
 
 
 65
 The above excerpted language contained background, and has no bearing whatsoever on the disposition of the appeal or the key issues raised on appeal concerning the sufficiency of the evidence supporting Leroy Logan's claims.
 
 
 66
 SO ORDERED.