92 F.3d 117
 72 Fair Empl.Prac.Cas. (BNA) 1748,
69 Empl. Prac. Dec. P 44,403
Stephen M. PADILLA and Equal Employment Opportunity
Commission, Plaintiffs-Appellees,
v.
METRO-NORTH COMMUTER RAILROAD, Defendant-Appellant.
 No. 1491, Docket 95-6056.
 United States Court of Appeals,
Second Circuit.
 Argued May 17, 1996.
Decided Aug. 13, 1996.
 
 Patrick M. Wall, The McCarthy Law Firm, New York City, for Plaintiff-Appellee Stephen M. Padilla.
 Paul D. Ramshaw, Equal Employment Opportunity Commission, Washington, DC (C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Equal Employment Opportunity Commission, Washington, DC, of counsel), for Plaintiff-Appellee Equal Employment Opportunity Commission.
 Charles S. Sims, Proskauer Rose Goetz & Mendelsohn LLP, New York City (Nina Massen, Beth Gorrie, Proskauer Rose Goetz & Mendelsohn LLP, New York City, Richard K. Bernard, General Counsel, Carol S. Barnett, Metro-North Commuter Railroad, New York City, of counsel), for Defendant-Appellant.
 Before: MESKILL and MINER, Circuit Judges, and LASKER, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendant-appellant Metro-North Commuter Railroad ("Metro-North") appeals from a judgment entered in the United States District Court for the Southern District of New York (McKenna, J.) following a jury trial. Plaintiff-appellee Stephen M. Padilla claimed that his employer, Metro-North, willfully retaliated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., ("ADEA") by demoting him after he participated in an Equal Employment Opportunity Commission ("EEOC") investigation of another Metro-North employee's charge of age discrimination. The district court upheld the jury's verdict in favor of Padilla on his willful retaliation claim and awarded him backpay, liquidated damages, and front pay until he is 67 years of age. For the reasons that follow, we affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 Given the jury's verdict for Padilla, we view the evidence in the light most favorable to him. Padilla began his employment at Metro-North in January of 1983. In April of 1985, he was promoted to the position of superintendent of train operations. As superintendent of train operations, Padilla was in charge of the operations control center ("OCC") at Metro-North and supervised approximately 35 employees. Padilla reported to Edmond Boni, the general superintendent of transportation, who was in charge of the transportation department at Metro-North. Boni, in turn, reported to Donald Nelson, who was Metro-North's vice president of operations.
 
 
 3
 One of Padilla's primary responsibilities was to ensure that trains arrived and departed on time. Padilla apparently succeeded in this task. A performance evaluation of his work that was prepared in August of 1987 stated that the "[o]n-time performance" of Metro-North's trains was "above goal in all categories," and his overall rating was listed as "Above Job Expectations." The evaluation also reported that Padilla was "[v]ery cost conscious and a perfectionist by nature," that he was an "[e]xcellent leader and a natural organizer" with the "ability to analyze problems and develop solutions very quickly and accurately," and that he had "done an outstanding job of managing dispatchers and towers while reducing costs."
 
 
 4
 One of the train dispatchers supervised by Padilla was Michael Barletta. Padilla testified that Barletta, who was over 60 years of age, had done an "excellent job." However, according to Padilla, Boni thought that Barletta was "too old for the job." Padilla testified that, beginning in mid to late 1986, Boni suggested that Barletta should be demoted, and that, in July of 1987, Boni insisted that Padilla demote Barletta. On July 28, 1987, Padilla demoted Barletta.
 
 
 5
 In October of 1987, Padilla travelled with Nelson on a business trip to London. Padilla testified that, during the trip, Nelson asked him "what was going on with this Boni-Barletta business." Padilla told Nelson that Boni had insisted "that Barletta was too old and too slow," and that Boni had "wrongly disqualified Barletta." According to Padilla, Nelson told him to "work it out with Boni," and Nelson "didn't really want to hear it any more."
 
 
 6
 In January of 1988, Barletta filed a charge with the EEOC, alleging age discrimination. After the EEOC commenced an investigation of the charge, an investigator interviewed Metro-North employees. Padilla was scheduled for an interview on April 6, 1988, but a major train accident occurred on that day. Padilla testified that he told Nelson that he was scheduled for an EEOC interview concerning the charge by Barletta, and that Nelson told him to reschedule the interview because he was needed to respond to the train accident.
 
 
 7
 Padilla's interview was moved to April 7, 1988, and, on that day, he met with the EEOC investigator. Karen Timko, one of Metro-North's in-house attorneys, also attended the interview. In an affidavit, Padilla asserted that, even though Barletta had "performed his job satisfact[orily]," Boni had insisted that Barletta be removed from his job. According to Padilla, Boni had stated that "Barletta had old working habits" and that "some of these old guys can't stand the stress because the jobs are more pressurized than they ever were before." In the affidavit, Padilla concluded, "I don't know the reason that Boni decided to disqualify Barletta for lack of performance but I don't think it was because of Barletta's age." Padilla testified at trial that this statement was untrue, and that he had made it to "save [his] job."
 
 
 8
 According to Padilla, Boni angrily approached him after the interview and told him that he had been "disloyal" and that he was "all done." Later that month, Boni again threatened Padilla that he was "all done" and that he was "going to get [him] for cooperating and being disloyal." Patrick McMahon, another Metro-North employee, testified that he had overheard this conversation, and that Boni had told Padilla, "[I]f you don't stop cooperating with them guys downtown, I'll take care of you.... I don't even have to do it myself, [I'll] get [Marijanke] Badurina [or another employee] to do it."
 
 
 9
 In February of 1987, Marijanke Badurina had been hired by Metro-North as a financial analyst to review the budget of the transportation department. At that time, the transportation department had four units: manpower control, tower operations, field operations, and the OCC. In the course of her review of the budgets of the manpower control and tower operations units, Badurina found problems in the administrative practices of those units. For instance, at the manpower control unit, Badurina found that employees often were working only about four days per week even though they were being paid for working five days. These payroll problems cost Metro-North millions of dollars. Nonetheless, none of the managers in the manpower control unit were demoted as a result of Badurina's findings, and the unit was given additional resources to correct the problem.
 
 
 10
 In her examination of the budget of the OCC, Badurina analyzed the OCC's weekly time sheets, which had been reviewed and approved by Andrew Favilla, one of Padilla's deputies at the OCC. Padilla himself did not routinely review these time sheets. In April of 1988, Badurina discovered through her examination of the time sheets that some OCC employees improperly had been using sick days to extend their two-day rest periods. Badurina told Boni about her findings, without first discussing them with anyone at the OCC. On May 3, 1988, Boni and Badurina discussed the problem with Nelson.
 
 
 11
 On May 4, 1988, Nelson held a meeting with Padilla. Padilla testified that this was the first time that he had been notified of the problem found in the OCC's payroll practices, and that he was unable to answer many of Nelson's questions because he had delegated the task of reviewing the weekly time sheets to Favilla. At the end of the meeting, Nelson placed Padilla on suspension, pending the outcome of an expanded investigation of the OCC's administrative practices. Nelson directed David Dieck, Metro-North's director of budgets and performance analysis, to conduct the investigation.
 
 
 12
 On May 9, 1988, Padilla filed a charge with the EEOC, alleging that Metro-North had suspended him in retaliation for his participation in the EEOC's investigation of Barletta's age discrimination charge. On May 10th, Nelson learned that Padilla had filed the charge with the EEOC.
 
 
 13
 On May 13, 1988, Nelson received a summary of findings from Dieck regarding his investigation into the OCC's administrative practices. Dieck's report confirmed that employees improperly had "coupled" sick days with rest days. The report also indicated that other administrative practices of the OCC needed to be corrected.
 
 
 14
 Nelson testified that he made the final decision to demote Padilla in the middle of May. On June 10, 1988, Nelson notified Padilla that he was being demoted from his position as superintendent of train operations. Nelson testified that he demoted Padilla because of the mismanagement at the OCC and because Padilla had become "withdrawn" and had "show[n] less interest in the job." Nelson asserted that Padilla's participation in the EEOC's investigation of Barletta's charge of age discrimination played no role in his decision to demote Padilla.
 
 
 15
 After his demotion, Padilla exercised his union rights to return to his former position as a train dispatcher. His salary decreased from about $65,800 as superintendent of train operations to about $45,000. Boni also was removed from his position as general superintendent of transportation, and was replaced by Richard Sinigiani. Favilla subsequently was promoted to Padilla's former position as superintendent of train operations.
 
 
 16
 On December 7, 1988, Padilla filed a complaint in the district court. In his complaint, Padilla alleged that Metro-North violated section 4(d) of the ADEA, 29 U.S.C. § 623(d), by demoting him in retaliation for his participation in the EEOC's investigation of Barletta's age discrimination charge. The EEOC subsequently filed a complaint in the district court, alleging that Metro-North violated the ADEA by demoting Padilla. The two actions were consolidated in March of 1990, and a jury trial commenced in June of 1994. On June 30, 1994, the jury returned a verdict finding that Metro-North had willfully retaliated against Padilla because of his participation in the EEOC's investigation of Barletta's charge.
 
 
 17
 Following the verdict, Metro-North moved for judgment as a matter of law, claiming that the evidence was insufficient to support the jury's findings of retaliation and willfulness. In addition, Padilla moved in the district court for equitable relief consisting of reinstatement or, in the alternative, front pay. In September of 1994, the district court conducted an evidentiary hearing in connection with Padilla's motion for equitable relief. The district court received affidavits and allowed cross-examination at the hearing. In an affidavit, Padilla stated that his former position as superintendent of train operations was "so specialized as to be virtually unique" and that "[t]here are no comparable positions in other industries." He asserted that his "skills at that position are so specialized that [he] would be extremely unlikely to find any position elsewhere at comparable pay."
 
 
 18
 On January 5, 1995, the district court denied Metro-North's motion for judgment as a matter of law. The district court found that there was sufficient evidence to sustain the jury's findings of retaliation and willfulness. The district court determined that Padilla was entitled to backpay from the date of his demotion until the entry of judgment in the amount of the difference between the salary received by him as a train dispatcher and the salary he had received as superintendent of train operations. In light of the jury's finding that Metro-North's violation of the ADEA was willful, the district court also determined that Padilla was entitled to liquidated damages through a doubling of the backpay award.
 
 
 19
 As to prospective relief, the district court denied Padilla's motion for reinstatement. The court stated that, because the relationship between Padilla and Metro-North had been "irreparably damaged by animosity associated with the litigation," reinstatement would be "unworkable." Instead, the court ordered that Padilla receive front pay in the amount of the difference between his salary and the salary paid to the superintendent of train operations until he reaches the age of 67 and will be entitled to receive a full pension.
 
 
 20
 In March of 1995, Metro-North moved, pursuant to Fed.R.Civ.P. 60(b), to vacate the front pay award. On July 21, 1995, the district court denied the motion. The district court first rejected Metro-North's contention that Padilla was not entitled to front pay under the Supreme Court's decision in McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Although Metro-North argued that Padilla would have been demoted in any event due to the false statement that he had made to the EEOC during its investigation of Barletta's charge, the district court found that there was "no adequate basis in the record ... for a finding that Metro-North, had it known that Padilla had not given his honest opinion to the EEOC investigators, would have terminated or demoted him for that reason." The district court also rejected Metro-North's argument that Padilla was not entitled to front pay because he had failed to mitigate his damages. The district court found that, although Padilla did not seek out other employment, there was "no convincing evidence that Padilla, now in his forties ... would be able to find work commensurate with his skills at a salary equal to what he received as Superintendent of Train Operations." (Quotation omitted and alteration in original).
 
 
 21
 On September 21, 1995, the district court entered an amended judgment,[1] ordering that Padilla receive backpay for the period from June 10, 1988 to June 30, 1994 in the sum of $132,706.87 plus interest. In addition, the district court ordered that Padilla receive $108,720 plus interest as liquidated damages. The district court also awarded Padilla as "front pay, for as long as he remains a Metro-North employee, commencing July 1, 1994, and ending when, during his sixty-seventh year, he becomes entitled to receive a full pension, ... the difference between his salary and the salary then payable to the Superintendent of Train Operations."[2] This appeal followed.
 
 DISCUSSION
 I. Sufficiency of the Evidence
 
 22
 Metro-North argues that there was insufficient evidence to support the jury's findings that Padilla was demoted in retaliation for his participation in EEOC proceedings and that the retaliation was willful. We disagree.
 
 
 23
 Judgment as a matter of law is proper "when there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]." Logan v. Bennington College Corp., 72 F.3d 1017, 1022 (2d Cir.1995) (quotation omitted and alterations in original). We must view "the evidence in the light most favorable to [the non-movant], and [give him] the benefit of all reasonable inferences from the evidence that the jury might have drawn in his favor." Id.
 
 A. Retaliation
 
 24
 Metro-North contends that Padilla did not carry his burden on "the ultimate issue: the sufficiency of the evidence that discrimination or retaliation 'caused' [Padilla's demotion]." A plaintiff asserting a retaliation claim "has the ultimate burden of persuasion to demonstrate that the challenged employment decision was the result of intentional discrimination." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir.1995) (quotation omitted). To satisfy this burden, the plaintiff must show that "a retaliatory motive play[ed] a part in the adverse employment actions." Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1254 (2d Cir.1987) (quotations omitted and alteration in original). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Cronin, 46 F.3d at 203.
 
 
 25
 In the present case, we think that a reasonable jury could have found that Metro-North demoted Padilla because of his participation in the EEOC's investigation of Barletta's age discrimination charge. As superintendent of train operations, Padilla had received favorable reviews of his performance. A performance evaluation prepared in August of 1987 listed his overall rating as "Above Job Expectations." However, Padilla testified that, in July of that year, he was directed by Boni to demote Barletta. In October of 1987, while on a business trip, Padilla told Nelson that Barletta had been "wrongly disqualified" because Boni thought he was "too old." Then, on April 6, 1988, according to Padilla, he told Nelson that he would be giving a statement to the EEOC in connection with Barletta's charge of discrimination. On May 4, 1988, Nelson suspended Padilla, and, on May 10th, Nelson learned that Padilla had filed a retaliation charge with the EEOC. On June 10, 1988, Nelson demoted Padilla.
 
 
 26
 Although Nelson asserted that Padilla was demoted because he had become "withdrawn" and because of his mismanagement of the OCC, the jury could have found that Metro-North demoted him because of his participation in the EEOC's investigation of Barletta's charge. First, Metro-North failed to show that Padilla had become withdrawn and that he had demonstrated a lack of interest in his work. In addition, although Badurina's budget analysis revealed that there were administrative problems at the OCC, when she previously had detected problems in the administrative practices of other units she first had met with managers of those units to attempt to resolve the problems. After discovering the problems at the OCC, however, Badurina did not allow Padilla an opportunity to provide a solution. Moreover, even though problems in the manpower control unit had cost Metro-North millions of dollars, no employees had been demoted in response. In contrast, even though the problems in the OCC had only cost Metro-North thousands of dollars, Padilla was demoted. In addition, Nelson acknowledged that he knew of Padilla's retaliation charge prior to demoting him, and, in view of Padilla's testimony of his conversations with Nelson in October of 1987 and on April 6, 1988, the jury could have found that Nelson knew of the content of Padilla's statement to the EEOC prior to suspending him. Boni's repeated threats to Padilla in April of 1988 also indicated that Padilla's position as superintendent of train operations was in jeopardy as a result of his participation in the EEOC's investigation. Accordingly, we think that there was sufficient evidence to support the jury's conclusion that Padilla's demotion was for purposes of retaliation.
 
 B. Willfulness
 
 27
 Metro-North also argues that there was insufficient evidence to support the jury's finding of willfulness. We disagree. The ADEA provides for the recovery of liquidated damages if there has been a "willful" violation of the act. 29 U.S.C. § 626(b). "A violation is willful if the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1571 (2d Cir.1989) (quotations omitted and alteration in original).
 
 
 28
 In the present case, Nelson acknowledged that he was "aware that there are federal laws that prohibit discrimination in employment" and "that it's a violation of law to take action against an employee who engages in activity protected by that law." In addition, Nelson conceded that he knew that "giving a statement to the [EEOC] is a protected activity under the law." Accordingly, because Nelson knew that it was illegal for him to demote Padilla in retaliation for Padilla's participation in EEOC proceedings, the jury was entitled to find that Nelson's retaliatory conduct was willful.
 
 
 29
 Metro-North, however, contends that the jury was precluded from finding that Nelson's actions were willful because Nelson testified that he "consulted with the Metro North legal department, with the attorneys, given the fact that Mr. Padilla had filed an action, and on their advice, agreed that [he] would do nothing further until the EEOC had completed their expedited review of the complaint." Metro-North relies on the Supreme Court's decision in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). In Thurston, company officials had sought legal advice and had consulted with union officials before implementing a new employee transfer plan, and the Court held that "[t]he record makes clear that [company] officials acted reasonably and in good faith in attempting to determine whether their plan would violate the ADEA." Id. at 129, 105 S.Ct. at 625-26.
 
 
 30
 Although Metro-North contends that the record here also shows that Nelson acted reasonably and in good faith in attempting to determine whether Padilla's demotion would violate the law, we do not agree. Nelson testified that he consulted with lawyers at Metro-North. However, Nelson did not testify that Metro-North's lawyers told him that Padilla legally could be demoted, nor did he indicate that he in good faith relied on any such advice in taking action against Padilla. Accordingly, the mere fact that Nelson may have consulted with Metro-North's legal department does not demonstrate that he acted in good faith in demoting Padilla.
 
 II. Front Pay
 
 31
 Metro-North contends that the district court erred in awarding Padilla front pay in the amount of the difference between his salary as a train dispatcher and the salary paid to the superintendent of train operations until he is 67 years of age. We disagree.
 
 A. Padilla's False Statement to the EEOC
 
 32
 Metro-North first argues that the award of front pay was improper because Padilla would have been demoted in any event due to the false statement that he made to the EEOC during its investigation of Barletta's age discrimination charge. In McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the Supreme Court held that, as a general rule, an award of front pay is not an appropriate remedy for a violation of the ADEA where an employer later discovers evidence of wrongdoing by its employee "of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id. at ---- ----, 115 S.Ct. at 886-87.
 
 
 33
 Metro-North argues that the misconduct in the present case consists of Padilla's admittedly false statement to the EEOC. Padilla had stated in an affidavit, "I don't know the reason that Boni decided to disqualify Barletta for lack of performance but I don't think it was because of Barletta's age." Metro-North contends that Padilla should be precluded from receiving front pay because "it would have demoted him from his managerial responsibilities 'in any event and upon lawful grounds' for his perjury."
 
 
 34
 However, we agree with the district court that "[t]here is no adequate basis in the record ... for a finding that Metro-North, had it known that Padilla had not given his honest opinion to the EEOC investigators, would have terminated or demoted him for that reason." In an affidavit, Nelson stated that he was "troubled by the prospect of the Court's ordering Metro-North to return an admitted perjurer to a relatively high-level supervisory position." In addition, Sinigiani, who had replaced Boni as general superintendent of transportation, stated in an affidavit, "The prospect of the Court's ordering Metro-North to reinstate an admitted perjurer to the Superintendent, Train Operations position is troublesome because I personally could not trust him to tell me the truth." Sinigiani also stated that it was important for him to be able to "rely upon the truthfulness of the [superintendent of train operations]" in connection with "critical record-keeping functions which affect the performance of Metro-North." However, despite their assertions that the prospect of Padilla returning as superintendent of train operations was troubling, neither Nelson nor Sinigiani stated that, if Padilla had remained as superintendent, his making of a false statement to the EEOC would have led to his demotion for that reason alone. Nor is there evidence that Metro-North had a policy in which it demoted managers for making such false statements, or that a manager had ever been demoted for this reason in the past. Because Metro-North does not show that Padilla's "wrongdoing was of such severity that [he] in fact would have been [demoted] on those grounds alone," id., Padilla's false statement to the EEOC did not preclude the award of front pay.
 
 B. Mitigation
 
 35
 Metro-North also argues that Padilla was not entitled to front pay because he failed to undertake reasonable efforts to mitigate his damages. We reject this contention. "A victim of employment discrimination has the same duty to mitigate his damages as any victim of a tort or breach of contract." Clarke v. Frank, 960 F.2d 1146, 1152 (2d Cir.1992) (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 231 & n. 15, 102 S.Ct. 3057, 3065 & n. 15 , 73 L.Ed.2d 721 (1982)). Under this duty, a claimant is required to "use reasonable diligence in finding other suitable employment." Id. (quoting Ford Motor Co., 458 U.S. at 231, 102 S.Ct. at 3065) (emphasis in original).
 
 
 36
 In the present case, Padilla remained at Metro-North as a train dispatcher after his demotion. In an affidavit dated September 12, 1994, Padilla stated that his former position as superintendent of train operations was "so specialized as to be virtually unique" and that "[t]here are no comparable positions in other industries." Padilla further stated:
 
 
 37
 The only comparable positions in the New York area are to be found (one each) at Amtrak, New Jersey Transit and the Long Island Railroad. There is no reason to believe that any one of those positions is now or will soon be available, or that it would be given to an outsider even if it were available.
 
 
 38
 Padilla concluded: "In short, the position for which I am uniquely qualified is the one from which I was illegally demoted. My skills at that position are so specialized that I would be extremely unlikely to find any position elsewhere at comparable pay."
 
 
 39
 Metro-North argues that Padilla's efforts at mitigation were insufficient because he failed to look for a position that was comparable to his former position as superintendent of train operations and instead simply remained at Metro-North as a train dispatcher. However, Metro-North bore the burden of showing that comparable positions were available for Padilla. See id. ("The employer bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain it."). Metro-North failed to provide any evidence that suitable work existed for Padilla, who had only a high-school education and had worked solely for the railroads since the age of 22. In view of the absence of evidence that suitable work existed for him and in view of his unique and narrow work qualifications, Padilla's failure to attempt to find a position comparable to that of superintendent of train operations did not constitute a failure to mitigate his damages. Moreover, given the lack of evidence of other opportunities available to Padilla, his decision to assume the position of train dispatcher at Metro-North after his demotion was reasonable mitigation. Accordingly, even though Padilla did not actively seek alternative employment, he acted reasonably in mitigating his damages.
 
 C. Duration of Front Pay Award
 
 40
 Finally, Metro-North contends that the duration of the front pay award granted by the district court to Padilla "is grossly out of line with the discretion that has been exercised [by federal courts in the past] in awarding front pay." We disagree.
 
 
 41
 This Court has encouraged district judges "to fashion remedies designed to ensure that victims of age discrimination are made whole." Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir.1984). We have stated that, in cases where "the employer-employee relationship may have been irreparably damaged by animosity associated with the litigation," id., reinstatement may not be possible, and "a reasonable monetary award of front pay is necessary as equitable relief ... appropriate to effectuate the purposes of [the act]," id. (quotation omitted and alterations in original). A front pay award "serves a necessary role in making victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Id. at 729.
 
 
 42
 In the present case, the district court awarded Padilla front pay in the amount of the difference between his salary as a train dispatcher and the salary paid to the superintendent of train operations until he reaches the age of 67. The district court determined that front pay in this amount and for this period of time was necessary because there was "no convincing evidence that Padilla, now in his forties ..., would be able to find work commensurate with his skills at a salary equal to what he received as Superintendent of Train Operations." We agree that Padilla "has no reasonable prospect of obtaining comparable alternative employment." Id. Padilla has only a high school education and his vocational experience has been confined primarily to serving as a dispatcher and a supervisor of dispatchers in the railroad industry. Padilla was able to obtain a salary of approximately $65,800 by developing these unique and narrowly focused skills, and it is very unlikely that he will be able to find alternative employment at this salary. Although Padilla indicated that one position comparable to that of superintendent of train operations exists at three other railroad companies in the New York area, there is no indication that he would be able to obtain one of these positions. Accordingly, the front pay award by the district court was necessary to make Padilla whole after his demotion.
 
 
 43
 We acknowledge that the award of front pay in this case is for a lengthy period of time--the district court ordered that Padilla receive front pay from July 1, 1994 until he becomes eligible at the age of 67 to receive a full pension. This award entitles Padilla to receive front pay for a period of well over 20 years. However, this Court and other circuits previously have affirmed awards of front pay for substantial periods of time when necessary to provide whole relief for victims of employment discrimination. See, e.g., Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d Cir.) (affirming front pay award for a period of 17 years in the total amount of $667,000), cert. denied, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). In view of the unique circumstances of this case, we think that the district court properly exercised its discretion in awarding front pay to Padilla until he reaches the age of 67.
 
 CONCLUSION
 
 44
 In view of the foregoing, we affirm the judgment of the district court.
 
 
 
 *
 The Honorable Morris E. Lasker of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The district court initially entered judgment on March 21, 1995
 
 
 [2]
 Padilla, who was born in 1952, will reach the age of 67 in the year 2019