**Domenick RASPENTE, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, a/k/a Amtrak, and John Springer, Defendants.**

No. 93 Civ. 1034 (DC).

United States District Court, S.D. New York.

May 7, 1996.

Fuchsberg & Fuchsberg by Harvey Goldstein, New York City, for Plaintiff.

Landman Corsi Ballaine & Ford P.C. by Ronald E. Joseph, New York City, for Defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

On June 15, 1992, Domenick Raspente, an individual with a long history of mental illness, was struck by a train while trespassing on railroad property under the influence of alcohol and medication. Raspente commenced this personal injury action against defendants National Railroad Passenger Corporation, a/k/a Amtrak ("Amtrak"), and John Springer to recover for his injuries.

On May 2, 1996, on the second day of the second trial of this case, I granted defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) dismissing the complaint. Although I stated my reasons on the record, I write now to more fully explain the basis for my decision.

### Statement of the Case

**A. Prior Proceedings**

This case was first tried from March 25, 1996 through April 2, 1996. Jury deliberations commenced the morning of April 2nd, and, at the end of the day on April 2nd, the jury wrote a note stating that it was deadlocked at 7–1. The jury returned the next day for further deliberations. In the early afternoon on April 3, 1996, it rendered a verdict as follows: It concluded that defendants were negligent and that plaintiff was contributorily negligent. It apportioned fault at 50% for plaintiff and 50% for defendants, but it awarded plaintiff zero in damages.

In view of the seriousness of plaintiff's injuries, the jury's finding that defendants were 50% at fault could not be reconciled with its award of zero in damages. Hence, I granted plaintiff's motion for a new trial, although I denied his request that the new trial be limited to a determination of the amount of damages. I also denied defen-

dants' motion for judgment on the pleadings. Although I was strongly of the view that plaintiff's claims were without merit, I also concluded that plaintiff had presented sufficient evidence from which a jury could reasonably conclude that defendants were at fault, at least in part. Argument was heard and my decision was rendered from the bench on April 24, 1996.

The second trial commenced on May 1, 1996.

## B. *The Second Trial*

At the second trial, plaintiff presented his own testimony and the testimony, by deposition, of Louis Coiro and John Springer. Coiro was the Amtrack police officer who found plaintiff at the scene of the accident. Springer was the train engineer who is also a defendant in the case. The only other evidence offered and received was a redacted copy of Coiro's report and two photographs of plaintiff's hip and leg (to show the injuries).

Significantly, an issue arose with respect to the distance between "catenaries"—metal configurations that hold up the overhead wires under which trains run—at the site in question. At the first trial, defendants had stipulated that the distance between catenaries was approximately 300 feet. After the first trial, however, defendants actually measured the distances, and because of those measurements, defendants refused to stipulate at the second trial to the distance between catenaries. Plaintiff's counsel was advised of these circumstances on the first day of trial, after opening statements had been given.

At approximately 11:25 a.m. on the second day of trial, plaintiff's counsel advised the Court that he had no other witnesses available to call at that moment, but that he had a witness on the way.[1] Hence, the trial could not proceed.

On one occasion during the first trial, the proceedings had to be adjourned early for the day and the jury sent home precisely because plaintiff's counsel did not have a

witness available to testify. I cautioned counsel at that time that if it happened again plaintiff would be deemed to have rested. Notwithstanding that warning, on a second occasion in the first trial plaintiff's counsel did not have a witness ready—fortunately, however, a witness appeared within a few minutes.

Because of these difficulties in the first trial, prior to the second trial I again instructed plaintiff's counsel to be sure that he had witnesses ready at all times so that the trial would not be delayed. Yet, on the second morning of the second trial, after the completion of plaintiff's testimony and following a mid-morning recess, plaintiff's counsel did not have a witness ready and available to testify.

Accordingly, I asked plaintiff's counsel what additional evidence he proposed to offer on liability. He responded that he intended to call his investigator, Alan Levine, and an Amtrak design engineer, George Brunner, both of whom testified at the first trial. He stated that their testimony would be essentially the same as their testimony at the first trial. He also stated that he intended to offer a videotape that was played at the first trial.

I ruled that plaintiff was deemed to have rested with respect to liability and that in deciding defendants' motion for judgment on the pleadings, I would consider, in the nature of an offer of proof, the testimony given by Brunner and Levine at the first trial. On the basis of the evidence presented at the second trial and assuming that, if called at the second trial, Brunner and Levine would testify as they did at the first trial, I granted defendants' motion.

## C. *The Facts*

Construed in the light most favorable to plaintiff, the evidence presented at the second trial and the testimony that Brunner and Levine would have given if called to testify showed the following:

---

1. About half an hour later plaintiff's counsel's associate advised the Court that he had just spoken with the witness and the witness had said he was on his way.

### 1. *Plaintiff*

Plaintiff Domenick Raspente is a 52–year old man who has a history of mental illness dating back at least to the 1960s. He has been on medication for many years, and his illness has prevented him from being gainfully employed since the 1970s. He also has a longstanding alcohol problem. Plaintiff's medical records report four suicide attempts, including one involving an overdose of barbiturates that led to his hospitalization. Raspente denied ever having attempted suicide. He testified that although he had seen the hospital records and blood test report with respect to the incident involving the barbiturates, he denied in his mind having attempted to commit suicide. He testified: "In my mind, I deny it."

Raspente had no recollection at all of the events surrounding the accident. His last recollection was that he boarded a Manhattan-bound "R" subway train at the Boro Hall station in Brooklyn after leaving the clinic where he received therapy and treatment at approximately 12:30 p.m. That morning he had received a month's supply each of two different medications. He has a vague recollection of intending to go to the Bronx Zoo. His next recollection is waking up two weeks later in Jacobi Hospital in The Bronx.

### 2. *The Accident*

On June 15, 1992, Springer started work at 5:30 p.m. He was to operate train number 193 from New Haven, Connecticut, to Penn Station, New York. The train consisted of an AEM–7 engine, eight passenger cars, and a baggage car.

At approximately 7:55 p.m., when it was still daylight, Springer had just taken the train across the Pelham Bay Bridge in a westerly direction at 45 miles per hour, in accordance with a speed restriction on the bridge. As he came off the bridge, the speed limit increased from 45 to 70 miles per hour. There is a right-hand curve, and as Springer came around the curve, he started to increase his speed.

As the train came out of the curve, and as he was starting to increase his speed, Springer saw a person standing in the middle of the tracks, approximately six or seven catenary lengths away. The person appeared to be walking toward the train, which was moving at approximately 46 miles per hour.

As soon as Springer saw the person, he blew the train's horn and brought the throttle back to zero. The train stopped accelerating and started to coast. He blew the horn many times over the next ten seconds to alert the person "to get the hell out of the way." When Springer started blowing the horn, the person looked up at the train. Within the first couple of seconds, he gradually started to get out of the way by moving to Springer's right. He then started to step over the north rail (the rail on Springer's right), and eventually did step over the rail.

At that point, the train was travelling perhaps 44 or 45 miles per hour and the person was four or five catenaries away. As the person stepped over the rail, he turned and stood sideways at the end of the tie-buts and looked up at the train. At that moment, Springer "realized [the person] was trying to kill himself" and threw the emergency brake, which resulted in the full-service application of the brakes on the passenger cars as well as the engine. The person was then about three catenaries away. The person did not move further, however, and was struck by the train. The train continued past the person and came to a stop, with the end of the last car approximately two train car lengths away.

The person who was struck by the train, of course, was Raspente. The Amtrak security officer who found him lying on the ground after the accident testified that Raspente, who was seriously injured, "reeked" of alcohol. The officer smelled alcohol not only on Raspente's breath but also "emitting from his wounds." An empty liquor bottle was lying on the ground some six to eight feet away from Raspente. Next to the bottle was an empty prescription vial that had Raspente's name on it. The officer found Raspente lying "teetered" on the track near Milepost 15 on a stretch of track on railroad property.

### 3. *The Relevant Distances*

The distance from the first catenary west of the bridge to Milepost 15 was 1,761 feet. The train was approximately 800 feet long, consisting of a 60–foot engine, eight 85–foot passenger cars, and a 60–foot baggage car. The stopping distance for this train, assuming that the train was travelling at 46 mph and that the passenger cars were half-full with passengers, was approximately 1,000 feet.

The only evidence in the record as to the distance between catenaries is Springer's deposition testimony that a catenary length was approximately 150 feet. Alan Levine, plaintiff's investigator who took certain measurements, did not testify as to the distance between catenaries or what a catenary length was.

### *Discussion*

### A. *Motion for Judgment as a Matter of Law*

A jury verdict is not to be set aside and judgment entered as a matter of law pursuant to Fed.R.Civ.P. 50(b) unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.' " *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993) (*quoting Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

In considering a Rule 50(b) motion, "a trial court must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels*, 992 F.2d at 16. Judgment as a matter of law is to be entered only where there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980); *accord Logan v. Bennington College Corp.*,

72 F.3d 1017, 1022 (2d Cir.1995); *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir.1994).

### B. *The Absence of Evidence of Negligence*

On the record presented at the second trial and incorporating the testimony given by Brunner and Levine at the first trial, I hold that no reasonable jury could find that defendants were negligent. The evidence in the record, construed in the light most favorable to plaintiffs, shows unequivocally that Springer acted reasonably in every respect. No reasonable juror could conclude otherwise.

When Springer cleared the bridge and came out of the curve, he saw Raspente standing between the rails six catenaries away. By Springer's estimate of a catenary length—approximately 150 feet—Raspente was approximately 900 feet away.[2] Since the train's stopping distance was approximately 1,000 feet, there was nothing that Springer could have done to stop before hitting Raspente.

Moreover, Springer had the right to assume that Raspente would move when he blew the horn, and Springer blew the horn immediately. *See Alba v. Long Island R.R.*, 204 A.D.2d 143, 611 N.Y.S.2d 196, 197 (1st Dep't 1994) ("It is the established rule in New York and the rest of the nation that when a train engineer sees a person on or near the track, he is not bound to stop his train immediately, but has the right to assume that in broad daylight, the person will see and hear the train, heed the danger, and leave the track.") (citations omitted); *Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 709 (2d Cir.1989) (applying, under Connecticut law, "widely accepted doctrine of railroad law" which provides that "absent knowledge of some disability on the part of a mature pedestrian seen on or near the tracks, a locomotive engineer who gives a proper alarm is entitled to assume that the pedestrian will heed the warning and move to a place of safety.") (citations omitted). In-

---

**2.** Although Springer testified that Raspente was six or seven catenaries away, the aerial photograph received in evidence at the first trial (and referred to by Levine in his testimony) shows that

it could not have been as many as seven catenaries and, indeed, that it probably was not even as many as six.

deed, Raspente *did* move initially, as he stepped over the north rail and off the tracks. Hence, Springer had even more reason to believe that Raspente was getting out of the way. Springer had no reason to know that Raspente was under the influence of alcohol and medication and suffered from mental illness.

After Raspente stepped over the rail, however, he stopped and made no further effort to move. Springer then realized that Raspente was not going to get out of the way and he threw the train into emergency. *See Alba,* 611 N.Y.S.2d at 197 ("[T]he engineer has no duty to make an emergency stop until he determines that the person cannot or will not remove himself from harm's way . . . .") (citation omitted). At that point, of course, several seconds had gone by and again it was too late—there was nothing that Springer could have done to avoid the accident. *Cf. Hayes v. New York,* 80 Misc.2d 385, 362 N.Y.S.2d 994, 997 (N.Y.Ct.Cl.1974).

Under these circumstances and on this record, no reasonable jury could find that Springer or Amtrak breached the duty to use reasonable care.

### C. *My Prior Denial of Defendants' Motion*

After the first trial, I denied defendants' motion for judgment as a matter of law because I determined that a jury could have reasonably found that Raspente was 1,800 feet away, because of Springer's testimony that Raspente was six catenaries away and the parties' stipulation that a catenary length was approximately 300 feet. Since the speed of 46 miles per hour is the equivalent of 67 feet per second, and since it would have taken the train 26.6 seconds to travel 1,800 feet at 67 feet per second, I concluded that the jury could have found that Springer was some 26 seconds away from Raspente when he first saw him, and that Springer was negligent because he should have determined more quickly that Raspente was not going to get out of the way.

At the second trial, however, the only evidence of the distance between catenaries was Springer's testimony that a catenary length was 150 feet. Hence, the jury could only

have concluded that Raspente was some 900 feet—rather than 1,800 feet—away when Springer first saw him.

Moreover, Levine testified that the distance from the first catenary west of the bridge to Milepost 15 was 1,761 feet. Since Springer's unrebutted testimony was that he had taken the train out of the curve at the time of the incident, the length of the train (800 feet) must be deducted from the 1,761 feet. That leaves approximately 961 feet, which, again, is an insufficient distance in which to stop. When one factors in the time that it reasonably required Springer to realize that Raspente was not going to get *fully* out of the way—after Raspente had *started* getting out of the way—it is clear that Springer did not have enough time to stop the train before hitting Raspente.

This testimony also makes it clear that, even assuming a catenary length was 300 feet—and that Springer was wrong about a catenary length being 150 feet—he was also wrong about Raspente being six or seven catenaries away when he first saw him. Indeed, the physical evidence shows that Springer's testimony at the first trial that he was approximately three 300–foot catenary lengths away (as he testified at the first trial after having realized that his deposition testimony was mistaken) is correct. Whether Springer was six 150–foot catenary lengths or three 300–foot catenary lengths away, he was roughly 900 feet away when he first saw Raspente. That distance is consistent with Levine's testimony, if one allows for the train having cleared the curve.

With the benefit of this further analysis, my initial denial of defendants' motion for judgment on the pleadings was incorrect, for taking into account Levine's testimony, Springer's unrebutted testimony that he had cleared the curve, and the aerial photograph, Springer could not have been six to seven catenary lengths away from Raspente if a catenary length is indeed 300 feet. Even assuming my initial analysis was correct, however, defendants' motion for judgment as a matter of law must be granted on the basis of the record of the second trial, for the jury

**528**

could only find that a catenary length was 150 feet.

### Conclusion

Defendants' motion for judgment as a matter of law is granted. The Clerk of the Court shall enter judgment dismissing the complaint with prejudice.

SO ORDERED.