**Theodore H. ROSENBLATT, Plaintiff,**

v.

**BIVONA & COHEN, P.C., Defendant.**

**No. 95 Civ. 4671 (SAS).**

United States District Court,
S.D. New York.

July 2, 1997.

Nathaniel B. Smith, Ranni & Smith, New York City, for Plaintiff.

Thomas W. Hyland, Edward P. Gilbert, Elizabeth M. Kelly, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Theodore Rosenblatt ("Rosenblatt") is suing Bivona & Cohen, P.C., alleging unlawful employment discrimination on the basis of race in violation of 42 U.S.C. § 2000e–2(a)(1), 42 U.S.C. § 1981 and New York Human Rights Law ("NYHRL")

§ 296.[1] Defendant now moves for summary judgment and plaintiff cross moves for partial summary judgment on the affirmative defense that plaintiff was not an employee for purposes of Title VII. The parties bring these motions pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's motion is denied and plaintiff's cross motion is granted.

## I. Factual Background

### A. Undisputed Facts

Rosenblatt maintained a relationship with Bivona & Cohen, P.C., for a dozen years. He joined the firm, then known as Levy, Bivona & Cohen, as a senior associate in 1982. Defendant's 3(g) Statement ("Def.'s 3(g)") at ¶ 1; Plaintiff's 3(g) Statement ("Pl.'s 3(g)") at ¶ 1. Initially, plaintiff was viewed as a competent attorney. Deposition of John Bivona ("Bivona Dep."), Bivona & Cohen President, at 86; Deposition of Marlene Monteleone ("Monteleone Dep."), Bivona & Cohen partner, at 17–18; Deposition of Joseph Figliolo ("Figliolo Dep."), Bivona & Cohen partner, at 29–30; Deposition of Marc Lust ("Lust Dep."), Bivona & Cohen partner, at 57–59. Plaintiff worked for several years in Unit 2 under the supervision of partner Marc Lust, until plaintiff was promoted to manager of Unit 3 and made a non-equity partner of the firm in 1986. Def.'s 3(g) at ¶ 4; Pl.'s 3(g) at ¶ 4. As director of Unit 3, plaintiff supervised the work of several associates and a junior partner. Def.'s 3(g) at ¶ 3; Pl.'s 3(g) at ¶ 3. His duties included several projects of firmwide significance, including production of master forms and billing practices, handling of firm insurance matters, and negotiation of the lease for the current office space. Affidavit of Theodore Rosenblatt ("T. Rosenblatt Aff.") at ¶ 6; Defendant's Reply Memorandum in Support of Motion for Summary Judgment ("Def.'s Reply") at 2.

In 1987, plaintiff, who is white, entered into an extramarital relationship with his secretary, Babsie Gould–Henry, who is black. Def.'s 3(g) at ¶ 8; Pl.'s 3(g) at ¶ 8. The pair remained co-workers throughout the majority of their affair of six years' duration, following which they were married in 1993. Def.'s 3(g) at ¶¶ 14–16; Pl.'s 3(g) at ¶¶ 14, 16. In December 1989, when Gould–Henry was pregnant with plaintiff's child, he permitted her, without prior authorization by the Partnership Governing Committee, to take an extended unpaid leave of absence. Def.'s 3(g) at ¶¶ 9–10; Pl.'s 3(g) at ¶¶ 9–10. Although Gould–Henry gave birth to plaintiff's child during this absence, plaintiff explained to defendant that the reason for the leave was caring for a sick relative in England. Def.'s 3(g) at ¶¶ 9–10; Pl.'s 3(g) at ¶¶ 9–10. Gould–Henry was terminated by letter dated February 1, 1990, and later rehired by defendant in mid–1990. Def.'s 3(g) at ¶ 14; Pl.'s 3(g) at ¶ 14; Defendant's Appendix ("Def.'s App."), Exh. D.

Plaintiff's ongoing relationship with Gould–Henry eventually became known throughout the firm. Def.'s 3(g) at ¶¶ 11, 13; Pl.'s 3(g) at ¶ 11; T. Rosenblatt Aff. at ¶ 9. In March 1992, plaintiff left his first wife and children to live with Gould–Henry, Def.'s 3(g) at ¶ 13, after which plaintiff alleges that he felt "increasing harsher criticism and pressure from Sidney Cohen and others." T. Rosenblatt Aff. at ¶¶ 10–11. In early 1992, Gould–Henry terminated her employment with defendant. Def.'s 3(g) at ¶ 15; Deposition of Theodore Rosenblatt ("T. Rosenblatt Dep.") at 138–39.

Two controversial events characterize the deterioration of plaintiff's relationship with the firm. First, although their accounts differ, the parties do not dispute that in December 1992, plaintiff became intoxicated at a firm Christmas party, leading to an encounter that a firm secretary reported as sexual harassment. Affidavit of John Bivona ("Bivona Aff.") at ¶ 9; Def.'s 3(g) at ¶¶ 18–20; Pl.'s 3(g) at ¶ 19; T. Rosenblatt Aff. at ¶¶ 27–28. Unable to recollect the incident, plaintiff nevertheless formally apologized at Bivona's direction. Def.'s 3(g) at ¶ 19; Pl.'s 3(g) at

---

**1.** Plaintiff originally alleged a violation of 42 U.S.C. § 1985(3), which has been abandoned. Prior to the instant motion, defendant moved for summary judgment on the grounds that plaintiff's action was premature and procedurally deficient, and that plaintiff lacked standing because he was not a member of a protected class. That motion was denied in its entirety. *See Rosenblatt v. Bivona & Cohen,* 946 F.Supp. 298 (S.D.N.Y. 1996).

¶ 19; Bivona Aff. at ¶ 9; T. Rosenblatt Aff. at ¶¶ 27–28.

Second, in mid–1993, AIG, one of defendant's significant clients, audited the firm's work and identified 34 late attorney status reports, 15 of which had been the responsibility of associates assigned to plaintiff's Unit 3. Def.'s 3(g) at ¶¶ 21–23; T. Rosenblatt Aff. at ¶¶ 30–35; Plaintiff's Appendix ("Pl.'s App."), Exhs. 9, 13–14; Bivona Aff. at ¶¶ 7–8; Cohen Dep. at 154–60. An additional six files belonged to Monteleone's Unit, five to Lust's, and four to Figliolo's. Pl.'s App., Exh. 14. The parties dispute the details of this audit and the resultant effect on defendant's business; however, it is undisputed that AIG sent a letter to defendant in August 1993, reporting its findings and observing that changes needed to be made in the handling of its account. T. Rosenblatt Aff. at ¶¶ 37–38; Pl.'s App., Exh. 9. AIG reported several inappropriately handled matters and suggested improvements in defendant's performance. Following the audit, AIG files were transferred from Unit 3 in late 1993, and the Unit was reorganized, including the demotion, transfer to another Unit and subsequent discharge of Mark Kalmanowitz, the junior partner directly under plaintiff's supervision. Def.'s 3(g) at ¶¶ 23–25; Pl.'s 3(g) at ¶ 25; Answer and Counterclaim ("Ans.") at ¶ 48; T. Rosenblatt Dep. at 236, 240.

In August 1994, John Bivona terminated plaintiff's employment. Def.'s 3(g) at ¶ 2; Pl.'s 3(g) at ¶ 2. None of the other Unit supervisors was terminated. At the time of plaintiff's discharge, Bivona & Cohen was organized as a professional corporation, the sole shareholders of which were John Bivona and Sidney Cohen. Pl.'s 3(g) in Support of Cross–Motion ("Pl.'s 3(g) in Support") at ¶ 2; Defendant's Second 3(g) Statement ("Def.'s Second 3(g)") at ¶ 2. Only Bivona and Cohen had the authority to discharge plaintiff from the firm. Pl.'s 3(g) in Support at ¶ 2; Def.'s Second 3(g) at ¶ 2. Plaintiff's employment was at all times at will. Pl.'s 3(g) in Support at ¶ 4; Def.'s Second 3(g) at ¶ 4.

**B. Disputed Issues**

**1. Disagreement over specific events**

Controversy surrounds several pivotal events during plaintiff's tenure with the firm.

While both parties agree that plaintiff misrepresented the reasons for his extension of an unauthorized leave to Gould–Henry in 1989, plaintiff alleges that, on learning of it, Bivona did not object to reserving Gould–Henry's position as plaintiff's secretary until her return. T. Rosenblatt Aff. at ¶ 18. By contrast, Cohen objected that the extended leave was in contravention of company policy. *Id.*; T. Rosenblatt Dep. at 136–38. Plaintiff maintains that Cohen ordered plaintiff to send a letter to Gould–Henry formally terminating her employment with the firm. T. Rosenblatt Aff. at ¶ 18; T. Rosenblatt Dep. at 136–38. Cohen testifies that although he was aware of the letter, he did not direct plaintiff to send it. Deposition of Sid [sic] Cohen ("Cohen Dep."), Bivona & Cohen Vice President and Secretary, at 89–92. Plaintiff maintains that the passage of approximately five years between this incident and his termination, as well as the history of extended leaves granted to the secretaries of other partners, indicates that defendant did not consider this a serious infraction. Affidavit of Babsie Rosenblatt ("B. Rosenblatt Aff.") at ¶ 11; Deposition of Tammy Hoffman ("Hoffman Dep."), Bivona & Cohen secretary, at 14–19.

Defendant contends that plaintiff attended a client-sponsored ski weekend on defendant's behalf in 1991, to which he brought Gould–Henry without permission. Bivona Aff. at ¶ 4. Defendant claims that while there, plaintiff became intoxicated and flaunted his extramarital affair in contravention of the conduct expected of a representative of defendant's firm at a business event. *Id.* In addition, defendant characterizes the 1992 Christmas party incident as an "extremely serious indiscretion" for which "[p]laintiff was severely reprimanded by the Partnership Governing Committee." Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def's Mem.") at 5. While plaintiff admits to having become intoxicated and to having been directed to apologize, he asserts that once his apology was accepted, the issue was not raised again during his tenure at the firm. Pl.'s 3(g) at ¶ 19; T. Rosenblatt Aff. at ¶¶ 27–29.

Plaintiff suggests that Cohen lied when questioned about the reason behind his failure to attend plaintiff's wedding in early December of 1993. T. Rosenblatt Aff. at ¶ 23. Cohen testified that it was his custom to spend the month of December in Vermont. Cohen Dep. at 150–51. Plaintiff counters that no firm records of such a trip exist, and that Lust testified to having discussed plaintiff's wedding with Cohen at the office the following Monday. T. Rosenblatt Aff. at ¶ 23. Plaintiff alleges that he canceled his pre-approved honeymoon due to what he perceived as Cohen's anger when the subject was raised, as well as a warning by Lust and Figliolo that "Cohen was prepared to fire me if I went on vacation." *Id.* at ¶ 24.

### 2. Plaintiff's interracial relationship

The parties are also in dispute as to when plaintiff's romantic involvement with Gould–Henry, was first perceived by defendant. Defendant alleges that the Partnership Governing Committee became aware of the relationship in 1987, and regarded it as "Plaintiff's personal business." Ans. at ¶ 41. Defendant contends further that plaintiff's interracial relationship "was common knowledge throughout the entire firm at all times from 1990," that the birth of plaintiff and Gould–Henry's child was known of "more than four years prior to Plaintiff's termination," and that defendant was already aware of this occurrence when it re-hired Gould–Henry in 1990. *Id.* at ¶ 42; Def.'s 3(g) at ¶ 12. Plaintiff denies these statements, conceding only that "[o]ver time, … knowledge of our relationship became more commonly known in the firm," despite his and Gould–Henry's efforts to keep the relationship private. Pl.'s 3(g) at ¶ 12; T. Rosenblatt Aff. at ¶ 9.

Notwithstanding defendant's argument that the Partnership Governing Committee knew of plaintiff's relationship as early as 1987, and that the rest of the firm knew by 1990, Cohen testified that he himself was unaware of the existence of this relationship as late as 1991. Ans. at ¶¶ 41–42; Cohen Dep. at 97–98. Cohen also testified to having seen Gould–Henry on only a few occasions and to having formed no opinion as to her

race, despite the fact that she was employed by defendant for seven years and in contrast to partner Martin Stewart's testimony that "everybody knew" that plaintiff's wife was black. Cohen Dep. at 82–83; Deposition of Martin Stewart ("Stewart Dep."), Bivona & Cohen partner, at 23.

Defendant contends that "[n]o one at Bivona & Cohen, P.C. ever voiced disapproval of plaintiff's relationship" and that plaintiff never heard any racially derogatory comments made by Cohen or Bivona. Def.'s 3(g) at ¶¶ 28, 30. Plaintiff alleges, however, that "[o]ver the years" other partners made various remarks "designed to inflict pain on [him] because of the color of [his] wife's skin." T. Rosenblatt Aff. at ¶¶ 12–13. Plaintiff contends that partners commented on his sexual preference for "dark meat," referred to a black street beggar or black waiter as a member of plaintiff's "family" or his "cousin," and asked whether plaintiff would be eating "chicken again" for dinner. *Id.* at ¶ 12. Plaintiff states that he felt himself an "outsider" and an "outcast" at the firm because of his relationship with Gould–Henry. *Id.* at ¶ 13. While plaintiff does not attribute racially discriminatory remarks directly to Cohen or Bivona, he alleges that Cohen was present when at least two such comments were made by others. *Id.* at ¶ 12; T. Rosenblatt Dep. at 166–67, 172–73. Plaintiff also asserts that when he informed Cohen of his decision to live with Gould–Henry, Cohen responded with an expression of disapproval of and hostility toward his interracial relationship. T. Rosenblatt Aff. at ¶¶ 10, 12; T. Rosenblatt Dep. at 61, 114.

### 3. Plaintiff's relationship with Cohen

The timing of the initial downturn in plaintiff's relationship with Cohen is also disputed. According to the testimony of defendant's partners, the relationship began to sour in 1991 following the client-sponsored ski weekend; yet plaintiff testifies that the turning point was March 1992, when he informed Cohen of his cohabitation with Gould–Henry. Figliolo Dep. at 93, 97–99; Monteleone Dep. at 17; T. Rosenblatt Aff. at ¶ 10. Plaintiff points out that prior to this time

[Cohen] gave me a lot of special projects. We worked closely together on a lot of these things, and commencing at approximately March of '92, is when he stopped either giving me new assignments or started being hypercritical over my handling of the assignments that he had previously given me.

T. Rosenblatt Dep. at 53–54. March 1992 is also the time at which plaintiff identifies the first of what he refers to as Cohen's veiled comments expressing disapproval of his relationship, "Something like, 'I don't understand you.' I believe that was the specific words he used, 'I don't understand you.'" *Id.* at 61. Plaintiff testified that this was also the first time at which joking comments about deficiencies in his appearance became serious. *Id.* Plaintiff asserts that Cohen made almost daily threats to his job, "either by direct threat or innuendo, or through Mr. Lust and Mr. Figliolo." *Id.* at 45. He also refers to Cohen's "irrational rants and ravings," recollecting that "[h]e would scream at me about isolated items, a memo of law having a mistake in the caption, about my responsibilities for the entire 24th floor." *Id.* at 47. At times, Cohen's behavior escalated to outright threats, such as screaming, "I am gonna fire you" and "I am gonna take you out of that chair." *Id.* at 48. Plaintiff also recounts discussing with Bivona "his concern about Sid's attitude towards me." *Id.* at 65. "There was one occasion he told me that if anything went wrong on the 24th floor, that Sid would consider it my fault and he included that if the bathrooms didn't work or the toilets didn't work that Sid would probably blame me." *Id.*

Plaintiff remembers having been warned on multiple occasions by both Lust and Figliolo that his job was in jeopardy. *Id.* at 43–44. After plaintiff took up residence with Gould–Henry in March 1992, he recalls at least one occasion on which Lust led plaintiff to understand that the reason his job was endangered was that, as plaintiff puts it, "Sid Cohen turned on me. He didn't approve of my relationship." *Id.* at 69–70. Plaintiff testified further that

Marc said that I shouldn't be seen with Babs because Sid might see us together. Marc told me not to have her come, that she shouldn't come up to the office to meet me after work. She shouldn't meet me at the car, she should go home by herself. And that was over a period of time in many, many such communications, that Sid Cohen was upset when he saw us and it just inflamed him and his anger at me.

*Id.* at 141; *see also* T. Rosenblatt Aff. at ¶¶ 20–21; B. Rosenblatt Aff. at ¶¶ 15–17.[2] Plaintiff also testified to having discussed with Lust on such occasions "how can I kiss Sid's ass more or please him more, or be more of what he wants, and cover up Babs, basically. That was the concept, the understanding." T. Rosenblatt Dep. at 61–71.

During a telephone conversation with Bivona in December 1993, plaintiff decided to confront Cohen regarding his disapproval of plaintiff's interracial relationship.

I then . . . told him I was gonna call Sid and try to meet with Sid because I wanted to sit down with him and try and talk man to man, outside the office, discuss his problems with me, and my relationships and whatever else he was concerned with. I called Sid and asked him if I could—told him I was willing to come from the Poconos to Vermont immediately, sit down with him, and his response was, "No, we have nothing to talk about."

*Id.* at 73–74. Early in 1994, plaintiff testifies that he was again rebuffed when he approached Cohen with the invitation, "'Sid, I'd like to talk to you.' He said, 'I don't want to talk,' he said, 'I don't want to get aggravated.'" *Id.* at 75.

**4. Events surrounding plaintiff's termination**

Plaintiff characterizes the July 1993 AIG audit and subsequent moratorium on new assignments to defendant as a pretextual reason for his termination. Pl.'s 3(g) at ¶ 23. Although Cohen testified that the late submission of attorney status reports uncovered by the audit: served as the catalyst for his decision to terminate plaintiff, plaintiff ar-

**2.** In addition, Gould–Henry testified that Lust commented to her that she could resume working for the firm if Sidney Cohen died. B. Rosenblatt Aff. at ¶ 18.

gues that the number of late reports filed by each Unit involved was proportional to the number of AIG files handled, and that his Unit filed 44% of the late reports solely because his Unit handled the greatest share of the AIG account. Cohen Dep. at 103, 154; T. Rosenblatt Aff. at ¶ 35. Plaintiff points out that other Units responsible for proportionally equivalent percentages of report mishandling were not reorganized, nor were their leaders terminated.

Plaintiff has also provided evidence that AIG's decision to withdraw certain business from Bivona & Cohen was due to many reasons in addition to the late reports. Pl.'s App., Exh. 13. He contends that the late status reports were only an insignificant part of the mishandling of AIG's account, in support of which he submits AIG's letter and report offering suggestions for firm-wide improvement. *See* Pl.'s App., Exhs. 9, 13.[3]

Also at issue is which individuals were specifically responsible for the decision to discharge plaintiff. Plaintiff alleges that his termination was at the direction of Sidney Cohen, which defendant denies. Pl.'s 3(g) in Support at ¶ 3; Def.'s Second 3(g) at ¶ 3. Defendant maintains that it was the Partnership Governing Committee, composed of John Bivona and Sidney Cohen, who made this decision. Bivona Aff. at ¶ 3. There are statements in the deposition testimony of Figliolo and Bivona to the effect that Cohen himself made the actual decision, and overruled others who disagreed. Figliolo Dep. at 93–99; Bivona Dep. at 159–62. Figliolo testified that from March of 1991 until August 1994, "if we didn't intercede, Ted would have been fired." Figliolo Dep. at 93, 98–99. Finally, in late spring of 1994, the tension escalated to the point that

> Sid wouldn't hear anything from any of us, if we brought up his name, "I don't want to

hear it," he said, "I want this guy out of here." And then we, what, I know I did, I went to John, I said, "John, it looks like my words are not getting anywhere. See what you can do, go in there, talk to Sid and see if you can change his mind and whatnots" And John said, "I'll see what I can do."

Figliolo Dep. at 97. Bivona also testified that he finally acquiesced in August 1994 to Cohen's desire to discharge plaintiff because "Sid was so adamant. Sid never yells at me. Ever. I've been with him for 25 years. Sid yells at everybody, but he never yells at me … He started yelling at me, and I knew he was right." Bivona Dep. at 160–61.

The question most heatedly disputed is the motivation behind plaintiff's discharge. Bivona claims that "Plaintiff's termination by Sid Cohen and myself was the result of a totality of circumstances occurring over a period of years." Bivona Aff. at ¶ 3. Defendant portrays plaintiff's termination as "a business decision … resulting from the cumulative effect of a number of deficiencies in Plaintiff's job performance," and asserts that "plaintiff was warned several times that his performance was unsatisfactory." Ans. at ¶¶ 47–48; Def.'s Second 3(g) at ¶ 5.

Plaintiff, in contrast, avers that "at all relevant times, [he] ably and competently performed his duties." Complaint at ¶ 9. Plaintiff reports that no explanation was offered for his termination other than Bivona's comments that "You know what's coming," and "you know why," and asserts that "it was clear to [him] that Cohen had finally prevailed in *his* quest to have [plaintiff] fired." T. Rosenblatt Aff. at ¶ 25 (emphasis in original). Plaintiff does not recall having been warned or reprimanded regarding the quality of his work, although he does testify to having been aware for several years that Cohen

---

**3.** Of the nine-page AIG audit report, only a portion of one page is devoted to the delinquent attorney status reports. Pl.'s App., Exh. 13. Although Cohen testified that defendant lost a substantial portion of its AIG business due directly to plaintiff's inefficiencies in overseeing the delinquent reports, plaintiff offers as contradictory evidence the memorandum sent to Unit leaders in response to AIG's letter, in which Bivona addressed the need of the entire firm to respond collectively to the AIG problem, making no effort

to pinpoint plaintiff or Unit 3 as having played any greater part than others. Cohen Dep. at 103; 157–58; Pl.'s App., Exh. 12. Plaintiff also provides testimony from Harold Jacobowitz of AIG, regarding the firm-wide breadth of errors uncovered by the audit as well as the decrease in AIG business assigned to all similarly situated firms. *See* Deposition of Harold Jacobowitz, American International Group Vice President of claims litigation, at 24–28, 43, 53; Pl.'s App., Exh. 9.

wanted to fire him and that other partners made multiple attempts to save his job. T. Rosenblatt Aff. at ¶¶ 25, 43. He contends that his termination was due to racial animosity and prejudice on account of his interracial marriage to Gould–Henry.

## II. Legal Standard for Summary Judgment

Federal Rule 56(c) provides that summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating a motion for summary judgment, all inferences justifiable in light of the totality of the evidence presented are to be drawn in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The function of a district court in the summary judgment context is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219 (2d Cir.1994).

In an employment discrimination case, the burden of proof rests at all times with the plaintiff alleging discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). This is especially true where the employer's intent is at issue. "Summary judgment is notoriously

inappropriate for determination of claims in which issues of … good faith and other subjective feelings play dominant roles." *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir.1993) (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)). Thus, although a plaintiff cannot withstand summary judgment by raising purely metaphysical questions, a "trial court must be cautious about granting summary judgment to an employer [and] affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224.

## III. Plaintiff's Motion for Partial Summary Judgment

■ Because it is potentially dispositive, I initially address the plaintiff's motion for partial summary judgment on the affirmative defense that plaintiff does not qualify as an employee for purposes of Title VII.[4] The parties do not dispute that defendant is a professional corporation with more than 14 employees and thus qualifies as an "employer" under 42 U.S.C. § 2000e(b). They also agree that plaintiff's employment was at all times at will and that John Bivona and Sidney Cohen, as sole shareholders of the firm, possessed the exclusive authority to discharge plaintiff. The parties dispute whether a non-equity partner of Bivona & Cohen is an "employee" under Title VII.

Section 701(f) of Title VII defines an employee as "an individual employed by an employer," to which it specifies several exemptions. 42 U.S.C. § 2000e(f). Neither this definition nor its exemptions address whether non-equity law firm partners qualify as employees.

■ Whether a "partner" qualifies as an "employee" depends on whether a true partnership relationship exists.[5] Courts in this

---

4. Because the relevant provisions of 42 U.S.C. § 1981 and NYHRL § 296 are governed by the same standards as Title VII in New York, these claims are addressed together.

5. Because Title VII, the ADA and the ADEA set forth identical definitions of the term "employee," courts generally cross-reference discussions of the standards required by these statutes. *See*

*Hyland v. New Haven Radiology Associates*, 794 F.2d 793, 796 (2d Cir.1986) (asserting that because the FLSA and the ADEA "have a similar purpose—to stamp-out discrimination in various forms—cases construing the definitional provisions of one are persuasive authority when interpreting the others"). This cross-construction method is also supported by the directive in the

Circuit have used tests both of organizational form and of economic realities to draw the "employee" boundaries on a case-by-case basis. While the Court of Appeals has recognized that "the benefits of the anti-discrimination statutes [generally] do not extend to those who are properly classified as partners," *Hyland v. New Haven Radiology Associates*, 794 F.2d 793, 797 (2d Cir.1986), the court has also concluded that an economic realities test need not be applied "where the individual involved is a corporate employee, ... for we hold that every such employee is 'covered' for purposes of the ADEA and that any inquiry respecting partnership status would be irrelevant." *Id.* at 798. After "[h]aving made the election to incorporate," the defendant professional corporation could not later call itself a partnership in substance. *Id.* The Court of Appeals recently reasserted that "[t]he fact that certain modern partnerships and corporations are practically indistinguishable in structure and operation ... is no reason for ignoring form of business organization freely chosen and established," in affirming a district court's refusal to grant summary judgment based on a per se partnership exemption. *E.E.O.C. v. Johnson & Higgins*, 91 F.3d 1529, 1537 (2d Cir.1996) (quoting *Hyland*, 794 F.2d at 798). *Hyland* explicitly provided that this rule extends to a professional corporation "whose structure resembles that of a partnership." *Id.* (explaining *Hyland*, 794 F.2d 793). Here, where defendant is admittedly a professional corporation of which plaintiff is a non-equity partner, plaintiff is a corporate employee for Title VII purposes.[6]

■ Even were defendant organized not as a professional corporation, but as a partnership, plaintiff would still qualify as an employee under Title VII. *Hyland* noted two factors the E.E.O.C. considers relevant to a determination of whether a "partner" is an "employee": the ability to "control and operate the business, and to determine compensation and the administration of profits and losses." *Hyland*, 794 F.2d at 798. Other courts have expanded on these factors and have established a three-part economic realities test consisting of at least the following factors: (1) the extent of an individual's ability to control and operate the business as evidenced by participation in policy decisions; (2) the extent to which an individual's compensation is based on a percentage of business profits; and (3) the extent of employment security enjoyed by the individual. *See Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F.Supp. 144, 149–50 (S.D.N.Y.1987) (rejecting a per se rule making partners exempt from ADEA protection and holding partner an eligible employee). Both parties agree that plaintiff's employment was at-will, thereby precluding his classification as a non-employee partner. A firm "may not fire a partner or otherwise terminate his employment merely because of disappointment with the quantity or quality of his work, but may only remove the partner in extraordinary circumstances." *Id.* at 149. Thus, even if Bivona & Cohen is considered to be a partnership, rather than a corporation, plaintiff is an employee under Title VII. Plaintiff's motion for partial summary judgment is therefore granted on this issue.

## IV. The Legal Framework in Employment Cases: Burdens of Proof

In an employment discrimination case in which direct evidence of discrimination is lacking, courts apply the *McDonnell Douglas* three-part burden shifting analysis characterized by the Supreme Court as the "allocation of burdens and the creation of a pre-

E.E.O.C. Interpretative Guidelines that defined terms are to have the same meaning under Title VII and the ADA. *See* 56 Fed.Reg. 35,740 (1991); *Jones v. Inter–County Imaging Centers*, 889 F.Supp. 741 (S.D.N.Y.1995).

6. Some courts that have found partners not to be employees for employment discrimination purposes have based that conclusion on Justice Powell's concurrence in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). As support for a rigid distinction between law firm partners and employees, defendant relies on Justice Powell's statement that "[t]he relationship among law partners differs markedly from that between employer and employee" *Hishon*, 467 U.S. at 79, 104 S.Ct. at 2235–36 (Powell, J., concurring). The *Hishon* concurrence also cautions, however, that "an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.'" *Id.* at n. 2.

sumption by the establishment of a *prima facie* case ... intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981). At the initial stage, the plaintiff must present evidence sufficient to establish a *prima facie* case of discrimination. In defending against a motion for summary judgment, the plaintiff's burden at this stage is de minimis. Once a *prima facie* case has been established, a rebuttable presumption of discrimination arises, and the evidentiary burden shifts to the defendant to articulate a legitimate reason for the disputed employment decision, which causes the presumption of discrimination to "[drop] from the case." *Id.* at 255, 101 S.Ct. at 1094–95. Finally, at stage three, the plaintiff is afforded the opportunity of demonstrating that the defendant's proffered reasons served merely as a pretext for discrimination.

As recently expounded by the Court of Appeals in an *en banc* decision, this burden-shifting framework provides a gift to the plaintiff by delaying his or her ultimate burden until the employer has been forced to narrow the scope of inquiry by offering a nondiscriminatory justification for its adverse decision. *See Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir.1997). Once the plaintiff makes a satisfactory *prima facie* showing, "the remaining elements (discrimination and causation) are presumed *at this stage* of the litigation." *Id.* at 133 (emphasis in original). Then, once the defendant has met its burden of articulating a legitimate reason, "plaintiff's burden is enlarged to include every element of the claim. Discrimination and cause are no longer presumed." *Id.* The plaintiff is now faced with his or her ultimate burden, which may be defined via "the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the

alleged conduct?" *Id.* at 1336. Thus, "once the minimal *prima facie* case has served its purpose of forcing the employer to proffer a reason, all presumptions drop out and the case proceeds like any other—*i.e.*, with the burden on plaintiff to prove the case by evidence of discrimination sufficiently persuasive to allow a favorable verdict." *Id.* at 1343.

Courts in this Circuit have held that, if an employee offers sufficient evidence that a jury could reasonably find in his or her favor, and the employer counters with a legitimate reason that does not as a matter of law require a finding in its favor, an inference on either's behalf is permissible and summary judgment is not appropriate. A plaintiff opposing summary judgment must simply show that the employer's proffered reasons do not tell the whole story, by producing evidence supporting a reasonable inference that an impermissible reason, such as race, played a significant role in the adverse decision. *See Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) ("a Title VII plaintiff can prevail by proving than an impermissible factor was 'a motivating factor,' without disproving that the employer's proffered explanation was not some part of the employer's motivation").[7] It is consistent with Title VII's purpose as it has been traditionally construed to require a plaintiff to show not " 'that the employer's proffered reasons were false or played no role in the employment decision, but only that [race] was at least one of the motivating factors.' " *Padilla v. Metro–North Commuter Railroad*, 92 F.3d 117, 122–23 (2d Cir. 1996) (quoting *Cronin*, 46 F.3d at 203). This proposition also reflects the 1991 Amendments to the Act, which modified Title VII to require a showing that "race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2. Thus, plaintiff is *not* required to prove that defen-

---

**7.** *See also Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 206 (2d Cir.1995) ("a plaintiff defending a motion for summary judgment need demonstrate only that a genuine issue exists as to whether, despite the employer's ostensible rationale and overall operations, intentional discrimi-

nation is the persuasive explanation for the plaintiff's treatment,"); *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983) (plaintiff "was not required to show that the reasons offered were false, but that they were not [defendant's] only reasons and that age made a difference").

dant's proffered reasons for the termination were false.

### A. Step 1: Establishment of a *prima facie* case

■ The elements comprising a plaintiff's *prima facie* case were initially defined as (1) membership in a protected class; (2) satisfactory performance of employment duties; (3) the occurrence of an adverse employment decision; and (4) replacement by an individual outside the protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Supreme Court, however, "expressly noted that the *McDonnell Douglas* standard, though a useful yardstick, is not necessarily applicable in every respect to differing factual situations [and] stressed that the *McDonnell Douglas* analysis is neither 'rigid' nor 'mechanized' and that the primary focus is always whether an employer treats an employee less favorably than other employees for an impermissible reason." *Montana v. First Federal Savings and Loan Assoc. of Rochester*, 869 F.2d 100, 104 (2d Cir.1989) (quoting *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)). A plaintiff is "not required to prove, as part of his *prima facie* case, that he was replaced by any employee or that his job continued to exist." *Hagelthorn*, 710 F.2d at 81; *see also Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985) (whether the plaintiff's position was refilled or eliminated "is of little relevance and should not sound a death knell to [plaintiff's] Title VII claim."). Rather, as the Court of Appeals stated in *Fisher*, a "preference for someone outside the protected class" will suffice for this element of the *prima facie* case. 114 F.3d at 1336–37.

There is no dispute that plaintiff has satisfied the first and third elements of a *prima*

*facie* case. This Court has previously determined that the plaintiff is a member of a protected class based on his interracial marriage, and plaintiff has been terminated from his employment. *See Rosenblatt*, 946 F.Supp. 298.

■ In support of his allegations that his performance was satisfactory and that he was qualified for his position, plaintiff points to admissions in the deposition testimony of Bivona, Cohen, and other partners that he was a capable attorney. Bivona Dep. at 85–86; Cohen Dep. at 144–45; Figliolo Dep. at 29–30; Lust Dep. at 57–59; Monteleone Dep. at 17–18. In addition, plaintiff notes that Unit 3 was more profitable than Units 1 and 2 for the years 1992 through 1994. T. Rosenblatt Aff. at ¶ 7; Pl.'s App., Exh. 1. Finally, plaintiff argues that the firm-wide management duties consistently entrusted to him indicate that his services were trusted and valued. T. Rosenblatt Aff. at ¶ 6. "[P]roof of competence sufficient to make out a *prima facie* case of discrimination was never intended to encompass proof of superiority or flawless performance [but solely] the basic skills necessary for performance of [the] job." *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir.1978). Plaintiff has met the de minimis burden of showing that he possessed the qualifications required by his position.[8]

■ Finally, although plaintiff was not replaced, he has satisfied the requisite showing of preference for someone outside the protected class. Although the AIG audit had analogous implications for the performance of other Unit supervisors, those managers were not terminated, nor were their cases transferred to other units.

### B. Step 2: Defendant Articulates Legitimate Non–Discriminatory Reason for Plaintiff's Termination

■ The burden now shifts to the defendant to come forward with a legitimate rea-

---

8. Defendant asserts that although plaintiff "was responsible for procuring and determining what malpractice insurance would be carried by Bivona & Cohen, drafting the defendant law firm's litigation form books, establishing Bivona & Cohen's billing guidelines and billing codes and dealing with the landlord with regard to lease negotiations for firm office space," plaintiff "just

didn't get the job done. He wouldn't complete any tasks." Def.'s Reply at 2; Figliolo Dep. at 96. These assertions raise a material issue of fact as to plaintiff's qualification; however, as "[i]t is not the province of the summary judgment court itself to decide what inferences should be drawn," this is a question for a jury. *Chambers*, 43 F.3d at 38.

son for plaintiff's termination that would, if believed, allow a factfinder to find in its favor. Defendant has amply met its evidentiary burden through provision of a plethora of nondiscriminatory reasons for plaintiff's discharge, consisting primarily in (1) plaintiff's failure to properly supervise attorneys under his authority and manage his Unit; (2) plaintiff's inept handling of files under his supervision, as reflected by client dissatisfaction; (3) plaintiff's misrepresentation to the Partnership Governing Committee as to the circumstances surrounding Gould–Henry's 1989 leave; and (4) plaintiff's public intoxication and harassment of another of defendant's employees. Defendant has therefore articulated sufficient legitimate non-discriminatory reasons for plaintiff's termination to dispel the presumption of discrimination arising from plaintiff's *prima facie* case

## C. Step 3: Plaintiff's Burden to Raise Fact Issue Regarding Defendant's Improper Motive

 Plaintiff now has the opportunity to show that defendant's proffered reasons serve as a pretext for discrimination. In *Burdine*, the Supreme Court taught that a plaintiff could prevail at phase three of the *McDonnell Douglas* analysis "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (emphasis added). In *St. Mary's*, the Supreme Court provided further clarification, holding that proof that the defendant's proffered reason was false was neither required nor sufficient in itself to establish the "pretext for discrimination." *St. Mary's*, 509 U.S. at 515, 113 S.Ct. at 2751–52. Proof of *discrimination* was thus the essential facet of the *McDonnell Douglas* plaintiff's case, whether adduced partly through proof that the proffered legitimate reason was untrue, or shown exclusively through evidence of discrimination. The Court of Appeals recently clarified that *St. Mary's* and *Burdine*

> do not require a finding of pretext in addition to a finding of discrimination.... Since a plaintiff prevails by showing that discrimination was a motivating factor, it

can invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind.

*Fields*, 115 F.3d at 121 (internal citations omitted). *See also Hagelthorn*, 710 F.2d at 81 (the "central question is whether [the] plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that age was a determinative factor in the employer's decision"). Therefore, the relevant question at this stage is whether plaintiff has succeeded in adducing evidence supporting a reasonable conclusion that race " 'was at least one of the "motivating" factors' " in defendant's decision to terminate his employment. *Fields*, 115 F.3d at 121 (quoting *Cronin*, 46 F.3d at 203). Plaintiff has met this burden.

 Defendant has put forward what it describes as "a litany" of reasons in support of its general contention that plaintiff was terminated because of long-term deterioration in his performance. Def.'s Mem. at 22. However, the record remains unclear regarding several material issues. Disparities exist between plaintiff's and defendant's evidence, as well as additional incongruities in the testimony of defendant's own partners, all of which give rise to questions of fact that can only be resolved at trial. On a motion for summary judgment,

> no special rules affect the weight to be given to the *prima facie* case, the truthfulness or falsity of the employer's explanation, or any other piece of evidence. As in any other type of case, the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination.

*Fisher*, 114 F.3d at 1347.

Plaintiff argues that defendant's proffered reasons are pretextual and that race was a motivating factor in his discharge because of (1) statistical and circumstantial evidence showing general firm policy and disparate treatment of those in the protected class; (2)

inconsistencies in the deposition testimony of defendant's partners regarding the reason for his termination; and (3) the sequence and timing of events preceding his termination. Plaintiff has proffered sufficient evidence to raise a fact issue as to whether race was a motivating factor in his termination. This question of fact precludes summary judgment.

First, plaintiff contends that Bivona & Cohen has never employed a black attorney during its 30–year history. *See* Bivona Dep. at 162–63; Cohen Dep. at 192.[9] Furthermore, plaintiff asserts that when he recommended a black associate in 1993, Cohen declined to interview him or review his resume, responding simply that "it would not be a good idea" to hire him. T. Rosenblatt Aff. at ¶ 15. Plaintiff's contentions regarding defendant's disparate treatment of both plaintiff and Gould–Henry could also contribute to a reasonable conclusion that race was a motivating factor in his termination. For example, plaintiff claims that after having agreed to represent Gould–Henry without charge in her divorce proceedings in 1987, defendant's partner Martin Stewart was forbidden by Cohen from doing so, although he was not directed to curtail his concurrent or subsequent representation of a white employee of the firm in a similar matter. B. Rosenblatt Aff. at ¶¶ 5–7; Stewart Dep. at 18–19. In addition, plaintiff contends that although he was required to terminate Gould–Henry's employment in 1989, the white secretaries of other partners, including Cohen himself, were allowed leaves exceeding stated firm policy. B. Rosenblatt Aff. at ¶¶ 8–11; Hoffman Dep. at 14–19; Def.'s App., Exh. C. Plaintiff also points to Cohen's failure to attend plaintiff's wedding, as well as Cohen's impassivity when racially discriminatory remarks were made in his presence, as evidence that race played a factor in plaintiff's termination.

Plaintiff argues additionally that the AIG episode is a pretextual justification for his termination. He offers proof that the AIG letter reporting the results of the audit "does not single out any particular unit's work, and the observations in the letter about 'areas where changes need to be made' apply equally to all of the units." T. Rosenblatt Aff. at ¶ 31. He argues that despite the fact that AIG suggested firm-wide changes in the handling of its files, defendant responded by reorganizing only plaintiff's Unit and terminating plaintiff, while leaving intact other Units responsible for a proportionally equivalent number of mishandled files. *Id.* at ¶¶ 31–34; Pl.'s App., Exhs. 9, 14. Particularly when viewed in conjunction with plaintiff's evidence that from 1992 through 1994 his Unit was more profitable than two of those whose directors were implicated by the AIG audit but not terminated, this circumstance could give rise to a reasonable conclusion that the loss of AIG business was a pretextual reason for terminating plaintiff's employment.

In addition, fact questions remain as to (1) who specifically was responsible for making the final decision to terminate plaintiff; (2) the veracity of defendant's reliance on long-dormant objections to plaintiff's "indiscretions" as potentially pretextual reasons for his termination; and (3) defendant's state of mind regarding the race of plaintiff's wife. The resolution of the remaining fact issues in this case could lead a finder of fact to reasonably conclude that the race of plaintiff's wife was a motivating factor in his termination. While neither Bivona nor Cohen's conduct was necessarily indicative of a discriminatory intent, neither was it, in light of plaintiff's evidence, unambiguously neutral. Although defendant has introduced evidence that plaintiff's termination may have been based on legitimate grounds, defendant has not succeeded in precluding an inference that the legitimate reasons proffered for plaintiff's discharge served as a pretext for a true discriminatory motive. As both inferences are permissible, "[i]t remains the province of the finder of fact to decide which inference should be drawn." *Cronin,* 46 F.3d at 206. *See also Hagelthorn,* 710 F.2d at 83 ("where

---

9. When asked at his deposition whether defendant had ever hired a black lawyer, Bivona initially responded "Yes," the firm had hired Ken Rolands; however, he quickly admitted that Rolands was not admitted to the New York Bar, and, while employed by defendant, had never appeared in court in the capacity of an attorney. Bivona Dep. at 162–63.

there is evidence of both a discriminatory reason and a legitimate reason for termination, it is for the fact-finder to determine").

## V. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied. Plaintiff's motion for partial summary judgment on the issue of his status as an employee is granted.